IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| DAVID E. CHARDAVOYNE | : | CIVIL ACTION NO. |
| Plaintiff, | : | 3:03-CV-56 (WWE) |
| | : | |
| | : | |
| VS. | : | |
| | : | |
| THAMES WATER HOLDINGS | : | |
| INCORPORATED, THAMES WATER | : | |
| NORTH AMERICA, INC. | : | |
| Defendants. | : | DECEMBER 16, 2005 |

## MEMORANDUM OF LAW IN SUPPORT OF
## THE DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

Stephen P. Fogerty, Esq.
CT Fed. Bar No. 01398
**HALLORAN & SAGE LLP**
315 Post Road West
Westport, CT  06880
Tele:  (203) 227-2855
Fax:   (203) 227-6992
E-mail:  Fogerty@halloran-sage.com

and

Ralph W. Johnson, III, Esq.
CT Fed. Bar No. 15277
**HALLORAN & SAGE LLP**
One Goodwin Square
225 Asylum Street
Hartford, CT  06103
Tele: (860) 522-6103
Fax:  (860) 548-0006
E-mail:  Johnsonr@halloran-sage.com

*Counsel for the Defendants,*
*Thames Water Holdings, Incorporated and*
*Thames Water North America, Inc.*

# TABLE OF CONTENTS

PAGE

PRELIMINARY STATEMENT ........................................................................... 1

BACKGROUND ............................................................................................... 3

I.    STATEMENT OF THE FACTS ...................................................................... 3

    A.    The Terms Of The Employment Agreement
        Between TWH And The Plaintiff ............................................................ 3

    B.    The Elimination Of The Plaintiff's Positions
        And The Providing Of The Written Notice Called
        For Under The Employment Agreement ................................................ 5

        1.    The Providing of Written Notice at the
            May 29, 2002 Meeting ................................................................. 6

        2.    The Written Notice Contained in the
            May 29, 2002 Letter Given to the Plaintiff ................................... 6

        3.    The Written Notice Contained in the
            Proposed Separation Agreement Given to
            the Plaintiff at the May 29, 2002 Meeting ................................... 6

        4.    The Plaintiff's Version of the May 29, 2002
            Meeting and His Admissions that Confirm
            His Receipt of Notice ................................................................. 8

        5.    The Plaintiff's Actions after the May 29
            Meeting that Demonstrate that He Received
            Notice ...................................................................................... 10

    C.    The Providing Of Supplemental Written Notice ................................... 11

        1.    The June 10, 2002 Letter from the Defendants'
            Counsel that Provided Additional and Detailed
            Written Notice to the Plaintiff .................................................... 11

        2.    The July 3, 2002 Letter from the Defendants'
            Counsel that Provided Additional and Detailed
            Written Notice to the Plaintiff .................................................... 12

    D.    The Plaintiff's Purported Resignation In December 2004 ...................... 13

E.    TWH's and TWNA's Ratification Of The Removal
Of The Plaintiff From All Positions ........................................................ 13

II.    THE PLAINTIFF'S CLAIMS .............................................................................. 14

STANDARD OF REVIEW ............................................................................................ 14

ARGUMENT ................................................................................................................. 15

I.    THE COURT SHOULD ENTER SUMMARY JUDGMENT
ON THE BREACH OF CONTRACT CLAIM ................................................... 15

A.    All Claims Against TWNA Fail As A Matter of
Law Because It Was Not A Party To The
Employment Agreement ........................................................................ 15

B.    The Written Notice Requirement Under The
Employment Agreement Was Satisfied As A
Matter Of Law ....................................................................................... 16

C.    The Plaintiff's Lack Of Notice Claim Fails As A
Matter Of Law ....................................................................................... 19

1.    Pennsylvania Law Supports the Entry of
Summary Judgment ................................................................... 19

2.    Other Jurisdictions Have Applied the
Reasoning from the Pennsylvania Decisions
in Employment Cases ................................................................ 23

a.    Alabama Case Law Supports the
Entry of Summary Judgment ......................................... 23

b.    Second Circuit/New York Case Law
Supports the Entry of Summary
Judgment ........................................................................ 25

c.    Case Law From New Mexico, Texas
and Connecticut Supports the Entry
of Summary Judgment .................................................... 27

D.    A Claim Regarding The 872 Shares Of RWE AG
Stock Cannot Be Asserted Against Either TWH Or
TWNA As A Matter of Law ................................................................. 28

E.    The Plaintiff's Miscellaneous Claims Are Without
Merit......................................................................................... 29

1.    Summary Judgment Should be Entered on
the Plaintiff's General Complaints Claims.................................. 29

2.    The Claims Based on an Alleged Abusive
Internal Statement and Two Emails Fail As
A Matter of Law ..................................................................... 32

F.    The Plaintiff's Claims For Medical and Retirement
Benefits Are Preempted By ERISA......................................... 34

II.    THE COURT SHOULD ENTER SUMMARY JUDGMENT
ON THE BREACH OF THE IMPLIED COVENANT OF
GOOD FAITH AND FAIR DEALING CLAIM ................................ 35

III.    THE COURT SHOULD ENTER SUMMARY JUDGMENT
ON THE CLAIMS UNDER THE CONNECTICUT WAGE ACT ................ 38

IV.    THE COURT SHOULD ENTER SUMMARY JUDGMENT
ON THE CONVERSION CLAIM..................................................... 39

CONCLUSION................................................................................ 40

## PRELIMINARY STATEMENT

The defendants, Thames Water Holdings, Incorporated ("TWH") and Thames Water North America, Inc. ("TWNA"), submit this memorandum of law in support of their motion for summary judgment on the Second Amended Complaint dated March 9, 2005. In further support of their motion, the defendants have submitted a Local Rule 56(a)1 statement of undisputed material facts and an appendix containing Exhibits 1 through 18.

This is a remarkable case. The plaintiff, David Chardavoyne, was employed by TWH under an Employment Agreement entered into in January 1999. During the first three years of his employment, he was paid approximately $700,000 in base salary. At a meeting on May 29, 2002, pursuant to paragraph 11.1(a) of the Employment Agreement, Chardavoyne was given written notice that his services were no longer needed and that unless he entered into a proposed separation agreement, his employment would end on May 29, 2003. That notice was supplemented by two detailed letters from the defendants' counsel on June 10 and July 3, 2002, eliminating the possibility of any confusion on Chardavoyne's part.

Under the proposed separation agreement that was given to Chardavoyne at the May 29 meeting, he was to receive his annual salary of $227,000, plus an additional $50,000. He rejected the offer. Consequently, pursuant to the terms of the Employment Agreement, he received his annual salary and benefits for the twelve month notice period ending May 29, 2003. During the notice period, Chardavoyne did no work whatsoever for the defendants and was not present at their offices. Now, alleging confusion about the purpose of the May 29 meeting and a failure to satisfy the notice provision of the Employment Agreement, Chardavoyne has commenced this action and seeks, inter alia, double his wages for the period between June 6, 2003 and December, 2004 as well as fringe and employee benefits for his alleged services after

June 30, 2003. Those alleged services were his personal decision to attend Spanish lessons in Costa Rica and conferences. Chardavoyne makes his claims despite the written materials that were provided to him and despite several telling concessions and acts, including: (1) his asking about a letter of reference and outplacement assistance at the May 29 meeting and (2) his returning credit cards and other corporate property on June 10, 2002.

Chardavoyne's claims are without merit. As a preliminary matter, all of his claims against TWNA are misplaced because TWNA was not a party to the Employment Agreement. And his claim for breach of the written notice provision against the defendants is without merit because he received the written notice due under the Employment Agreement. Even assuming arguendo that the written materials provided to Chardavoyne did not satisfy the notice provision, his claim fails as a matter of law because it is undisputed that he received the wages and benefits that he was entitled to during the twelve month notice period.

Similarly, Chardavoyne's claims based on an alleged failure to pay him 872 shares of RWE AG stock under a March 27, 2002 Award Notice are without merit because neither TWH nor TWNA granted him the stock. Even as alleged, the remainder of Chardavoyne's contract claims fail because the alleged acts do not violate any provision of the Employment Agreement.

Finally, Chardavoyne's claims under the Connecticut Wage Act should be dismissed because: (1) he was paid and (2) he was employed in New Jersey as of January 4, 2002, and thus cannot rely on the Connecticut statute.

Accordingly, for the reasons set forth below, the Court should grant the defendants' motion.

## BACKGROUND

I.   **STATEMENT OF THE FACTS**

   A.    **The Terms Of The Employment Agreement Between TWH And The Plaintiff**

   TWH and Chardavoyne entered into an Employment Agreement on or about January 15,

1999. (Ex. 1, Employment Agreement, at 1; see Second Am. Compl., Ex. A)  The agreement

was *between* TWH and Chardavoyne. (Employment Agreement, at 1, see id. (defining TWH as

the "Company" under the agreement))

   During his employment with TWH, Chardavoyne was to perform such duties "in relation

to the business of the Parent Company as may from time to time be vested in or assigned to him

by his Line Manager" and he was required to "in all respects comply with the reasonable

directions given by or under the authority of his Line Manager." (Id. at 2, ¶ 2.4) James

McGivern was identified in the Employment Agreement as Chardavoyne's "Line Manager" and

he held that role throughout Chardavoyne's employment with TWH. (Id. at 1, ¶ 1.1) Under the

agreement, Chardavoyne was required to, "without further remuneration," carry out duties on

behalf of any other Group Company for as long as required by the Chief Executive. (Id. at 2, ¶

2.5) William Alexander was identified as the Chief Executive under the Employment

Agreement. (Id. at 1, ¶ 1.1)

   As part of the Employment Agreement, TWH reserved the right "to change, modify or

cancel at its sole discretion from time to time any or all of [the] benefits [promised to

Chardavoyne]." (Id. at 3, ¶ 5.4)  TWH promised to provide Chardavoyne "with a car for his use

in the business of the Company or any Group Company...." (Id. at 3, ¶ 7)

   Paragraph 11 of the Employment Agreement established a notice period in connection

with the termination of Chardavoyne. Specifically, it provided as follows:

11.1   Save as provided for in Clauses 12.1, 12.2 and 12.3 below, the Executive's employment hereunder shall continue subject to the terms of this Agreement until terminated.

(a)   by the Company [TWH] giving to the Executive not less than twelve months' written notice expiring at any time; or

(b)   by the Executive giving not less than six months' written notice expiring at any time.

(Employment Agreement at 4)

The Employment Agreement also identified Chardavoyne's duties upon his termination. (Id. at 5-6, ¶ 13) Upon his termination for any reason, Chardavoyne was required to "forthwith resign from any offices held by him in the Company or any other Group Company...." (Id. at 5, ¶ 13.1) Chardavoyne was further required to deliver to the Company "all correspondence, documents, specifications, papers, magnetic disks, tapes or other software storage media, credit cards, petrol cards, and other property belonging to the Company or any other Group Company," which may have been in his possession or control. (Id. at 6, ¶ 13.2) Upon his termination, Chardavoyne was also required to "immediately return to the Company in good condition any car provided to him pursuant to Clause 8 ... and any other communication or computing equipment and peripheral devices belonging to the Company." (Id. at 6, ¶ 13.3)

Paragraph 14 of the agreement provided that "[t]he Chief Executive may at any time during the term of ... [Chardavoyne's] employment hereunder elect not to provide work for [Chardavoyne] to do and/or require ... [Chardavoyne] not to attend at the premises of any Group Company and no such event shall constitute a repudiation of this Agreement or dismissal of ... [Chardavoyne] whether constructive or otherwise." (Id. at 6, ¶ 14)

4

The Employment Agreement also contained a choice of law provision. It provided that the agreement "shall be governed by and constructed in accordance with the laws of the Commonwealth of Pennsylvania." (Employment Agreement, at 10, ¶ 24)

**B.    The Elimination Of The Plaintiff's Positions And The Providing Of The Written Notice Called For Under The Employment Agreement**

In May, 2002, Alexander was the Chief Executive of Thames Water Plc, the parent company under the Employment Agreement. (Ex. 2, Alexander Depo. Tr. at 10; Employment Agreement, at 1, ¶ 1.1 ) Matthew Huckin was the Director for Human Resources for the Americas Region of Thames Water Plc. (Ex. 3, Huckin Depo. Tr. at 15) In addition to being Chardavoyne's Line Manager, McGivern was the chairman of TWNA's board of directors. (Ex. 4, McGivern Depo. Tr. at 18-19; Ex. 7, Pl.'s Depo. Tr. at 135)

Prior to May 29, 2002, Alexander had conversations with McGivern, Huckin, and others regarding the termination of Chardavoyne. (Alexander Depo. Tr. at 21-22; Huckin Depo. Tr. at 61-62; McGivern Depo. Tr. at 61-63) McGivern kept Alexander informed regarding the situation with Chardavoyne. (McGivern Depo. Tr. at 63-64) In particular, McGivern discussed the general terms of dismissing Chardavoyne and attempting to reach an agreement whereby Chardavoyne would leave his employment with immediate effect. (Id. at 64-65) McGivern continued to update Alexander regarding the situation with Chardavoyne following a May 29, 2002 meeting, at which Chardavoyne was given written notice of termination. (Id. at 91-94)

Alexander approved the termination of Chardavoyne's employment. (Alexander Depo. Tr. at 22-23) The decision to terminate Chardavoyne was made in connection with a forthcoming closing of a merger and as a result of dissatisfaction with Chardavoyne's performance. (Huckin Depo. Tr. at 63-64)

5

### 1.    The Providing of Written Notice at the May 29, 2002 Meeting

On May 29, 2002, McGivern and Huckin met with Chardavoyne at his office in Voorhees, New Jersey.  (Huckin Depo. Tr. at 116)  McGivern informed Chardavoyne that the corporate structure following the merger had been reviewed and there was no future role for Chardavoyne.  (Id. at 117)  At first, Chardavoyne was surprised about his termination.  (Id.)  He asked why he was not getting the presidential role following the merger.  (Id.)  Subsequently, he asked whether he would receive a letter of recommendation from Alexander and outplacement assistance.  (Id.; Pl.'s Depo. Tr. at 98)

During the meeting, Chardavoyne was provided with a notice of termination letter and a proposed separation agreement.  (Huckin Depo. Tr. at 118; Ex. 5 (5/29/02 Letter); Ex. 6 (Proposed Separation Agreement); see Second Am. Compl., Exs. B-C)

### 2.    The Written Notice Contained in the May 29, 2002 Letter Given to the Plaintiff

The notice letter given to Chardavoyne at the May 29 meeting stated, in relevant part, as follows:

> It is with regret that I must confirm that with immediate effect your services are no longer required by the company.
>
> A written separation agreement accompanies this letter.  You have the right to consult your own lawyer for advice about the agreement....

(Ex. 5 (5/29/02 Letter); see Second Am. Compl., Ex. B)

### 3.    The Written Notice Contained in the Proposed Separation Agreement Given to the Plaintiff at the May 29, 2002 Meeting

TWH was included among the entities listed in the definition of the word "Company" in paragraph 1.01 of the proposed separation agreement.  (Proposed Separation Agreement; see Second Am. Compl., Ex. C)  Paragraph 2.01 acknowledged that Chardavoyne was retained as

the president of TWH on February 15, 1999. It noted that when his employment "ended," he held that same position. Paragraph 2.02 stated that on May 29, 2002, the Company told Chardavoyne "of its elimination of his position." It further stated that:

> the employment agreement between the Parties requires the Company to give the [plaintiff] 12 months' advance notice of the termination of his employment for reasons other than cause. It further allows the Company to assign no duties to the [plaintiff] during the notice period. The Parties' employment agreement also prohibits the [plaintiff] from having any other employment during the notice period. It further imposes restrictions on the [plaintiff's] competitive activities for an additional period of 12 months after the notice period ends.

Paragraph 2.03 provided that the separation agreement will restructure the parties' obligations "in view of the elimination of the [plaintiff's] job." The separation agreement "abandon[ed] the notice period to terminate the [plaintiff's] employment and allow[ed] him to have non-competitive employment immediately." (Proposed Separation Agreement, ¶ 2.03)

Paragraph 3.03 of the separation agreement provided that in addition to severance pay in an amount equal to one year's salary, $227,000, Chardavoyne was to receive a check in the amount of $50,000 less withholding, as a lump sum. Paragraph 3.06 stated that:

> the Company has eliminated the [plaintiff's] job effective the close of business on May 29, 2002. Simultaneously with the elimination of the [plaintiff's] position as President of Thames Water Holding Incorporated, the Company has removed him from each of the officer and director's positions that the [plaintiff] held within the Company. In addition, the Company has revoked the [plaintiff's] authority to represent the Company in the capacity of an officer or a director of any committee or organization outside the Company. .... After May 29, 2002, the [plaintiff] shall neither speak nor act, or both, as the Company's representative without prior written authorization to do so from the Chief Executive Officer of Thames Water, Plc.

(Proposed Separation Agreement; see Second Am. Compl., Ex. C)

Paragraph 3.19 provided that if Chardavoyne had not already done so, he was required to return to the Company all business property in his possession, including credit cards and keys. Paragraph 3.20 provided that with regard to the vehicle provided to Chardavoyne for business-related use, during his employment, Chardavoyne would be allowed to use that car until July 31, 2002, at which time he was to return it.

Paragraph 5.01 acknowledged that the release contained within the agreement related to all claims concerning either Chardavoyne's "employment with the Company or such employment's termination, or both." (Id.)

### 4.    The Plaintiff's Version of the May 29, 2002 Meeting and His Admissions that Confirm His Receipt of Notice

According to Chardavoyne, on May 28, 2002, McGivern ordered him to attend a meeting in Voorhees, New Jersey, the next day. (Ex. 7, Pl.'s Depo. Tr. at 88-90) Chardavoyne admits that Voorhees was where he worked. (Id. at 90) Chardavoyne maintains that at the outset of the May 29 meeting, McGivern said that after the completion of the merger, he and Huckin did not see a Thames Water North America role for Chardavoyne. (Id. at 92) According to Chardavoyne they said that rather than wait until the close of the transaction, they wanted to offer Chardavoyne an agreement that was better than his existing agreement and that they would like him to talk to an attorney and get back to them. (Id. at 93) Thus, Chardavoyne characterizes the meeting as "simply a conversation where they said 'we don't think that [a] Thames Water North America position is going to exist after the close of American, so we would like to offer you this now, take a look at it, get back to us.'" (Id.) After the statement was allegedly made, Chardavoyne maintains that Huckin handed him an envelope and said an agreement was in it. (Id.)

Chardavoyne contends that in response to Huckin's comments, he stated that he wanted his attorney to look at the document. (Pl.'s Depo. Tr. at 93) The meeting ended without Chardavoyne shaking hands with either McGivern or Huckin. (Id.) According to Chardavoyne, he did not work for any company that either McGivern or Huckin was affiliated with. (Id. at 94) Rather, he "worked for Thames Water Holdings, Inc." (Id.) Nevertheless, Chardavoyne concedes that McGivern was his Line Manager and that McGivern's authority over him was defined by the Employment Agreement. (Pl.'s Depo. Tr. at 94-95)

Chardavoyne maintains that he was confused about the conversation on May 29, 2002 because McGivern and Huckin were referring to the position of president of TWNA. (Id. at 96) Chardavoyne knew that he was the president of TWH. (Id.) TWNA was a subsidiary of TWH. (Id.) He was also the president of TWNA. (Id. at 96, 135)

Chardavoyne acknowledges that during the May 29 meeting, he did ask McGivern and Huckin whether there was "a provision for a recommendation from Bill Alexander" and whether there were "any outplacement services provided [for] in this agreement?" (Id. at 98) He maintains that the answer to both questions was no. (Id.)[1] Chardavoyne contends that based upon these two answers, he knew that the agreement he was being offered "was not better than what [he] had,…and at that point [he] shut up." (Pl.'s Depo. Tr. at 98)

Chardavoyne also acknowledges that during the May 29 meeting, Huckin discussed the fact that the agreement he was being provided with would allow him to keep his car for two

---

[1]/     The plaintiff also testified that based on his experience as a senior executive who had had to release vice presidents, "one of the things that you always put in an agreement is *you try to help the person to the next job*, you put in outplacement, letters of recommendation. If there isn't a fit, you know, especially with an individual who has gotten bonuses every year, salary increases every year, you know, great glowing words, if you're structuring some sort of agreement, you would put those in as a matter of course." (Pl.'s Depo. Tr. at 99 (emphasis added)

months. (Id. at 99-100)  Chardavoyne further maintains that during the May 29 meeting, he was instructed not to return to the Voorhees office while he was reviewing the document he was given during the meeting. (Id. at 107)  McGivern and Huckin wanted Chardavoyne to take his personal items out of his office and not to come back. (Id.)

During the May 29 meeting, Chardavoyne took notes.  In those notes, he wrote that he needed to receive a letter of recommendation from Alexander. (Pl.'s Depo. Tr. at 92, 103-04; Ex. 8 (Pl.'s notes))  He needed a letter of reference in order to be able to get another job. (Pl.'s Depo. Tr. at 103-04)

### 5.   The Plaintiff's Actions after the May 29 Meeting that Demonstrate that He Received Notice

After the May 29 meeting, Chardavoyne took a few personal items out of his office. (Id. at 106)  Although Chardavoyne maintains that Huckin did not have the authority to write the letter that was provided to him at the May 29 meeting, he testified at his deposition that he did not return to his office in Voorhees because he knew that the locks had been changed so he could not get into the office. (Id. at 108-09)  He further maintains that after speaking with his attorney on May 30, 2002, he did not return to work based upon the advice of his counsel. (Id. at 109)  He was also expecting a telephone call from Alexander, once Alexander found out what had happened. (Id. at 110-11)

On June 10, 2002, in response to a request from Huckin, Chardavoyne mailed Huckin two credit cards and a telephone card that had been provided as part of his employment. (Ex.9, Pl.'s 6/10/02 Letter; Pl.'s Depo. Tr. at 115)  He returned the cards because the company wanted them back. (Pl.'s Depo. Tr. at 115-16)  He returned them to Huckin because it was Huckin who asked for them. (Id. at 116)

Despite requests that the company car be returned, Chardavoyne refused to return it. (Id. at 116, 157) He did not return the car because he maintains that it was provided for under his Employment Agreement and he was still an employee. (Pl.'s Depo. Tr. at 116) With regard to the agreement's provision for a car to be provided to Chardavoyne "for his use in the business of the Company…," Chardavoyne maintains that during the period after the May 29 meeting, he "was operating under section 14 of the agreement,…." (Id. at 117-18; see id. at 119)

With regard to the duties he performed as an employee of TWH after the May 29 meeting, Chardavoyne alleges that he attended industry conferences and took Spanish lessons in Costa Rica. (Id. at 119-20) After May 29, 2002, he does not recall performing any duties or providing any services as a director of either TWH or TWNA. (Id. at 138)

**C.    The Providing Of Supplemental Written Notice**

**1.    The June 10, 2002 Letter from the Defendants' Counsel that Provided Additional and Detailed Written Notice to the Plaintiff**

On June 10, 2002, Gerald M. Richardson, Esq., counsel for the defendants, wrote Chardavoyne's counsel in response to Chardavoyne's rejection of the separation agreement and his counter-proposal. (Ex. 10, Richardson Aff. ¶ 2 & Ex. A thereto) The June 10 Letter acknowledged that Chardavoyne had the right to reject the offer. (Id.) However, it reminded Chardavoyne's counsel that that decision would leave Chardavoyne in the position of his having his employment terminated without cause pursuant to the Employment Agreement. (Id.)

Moreover, the June 10 letter reminded Chardavoyne's counsel that under the agreement, TWH had the unqualified right to terminate Chardavoyne without cause upon giving him 12 months' advance notice. (Id.) It further reminded Chardavoyne's counsel that "the Company's communication of its intention to terminate [Mr. Chardavoyne's] employment without cause in conjunction with its separation agreement offer initiated the beginning of the notice period if the

parties reached no separation agreement. Consequently, absent such an agreement, Mr.

Chardavoyne's employment ends on May 29, 2003." (Id.) The June 10 Letter further stated

that:

> [t]he Agreement,...allows the Company to provide no work to Mr.
> Chardavoyne and to require him to stay away from its premises in
> its non-tenants provisions. Assuming the absence of a separation
> agreement, then the Company began its exercising of its rights
> pursuant to the Agreement's non-attendance provisions effective
> May 29, 2002. On that date, the Company clearly communicated
> its elimination of Mr. Chardavoyne's job, which left him with no
> duties to perform. In addition, it told him of its expectation for him
> to remove his personal belongings from the Company's premises
> and to return all of the company's property in his possession or
> under his control.

The June 10 Letter expressly advised Chardavoyne's counsel in detail of what would

happen if no separation agreement was entered into by the parties. (Id. at 1-3) For example, it

indicated that Chardavoyne would receive his base salary at the rate of $227,000 annually less all

withholding through May 29, 2003 and his benefits. (Id. at 1-2; see id. at 2 ("Mr. Chardavoyne

will receive payments equal to his salary for one year, and he will have no duties. ")) It further

indicated that Chardavoyne would have to take his accrued vacation time "during the notice

period" and that he would be considered for a bonus in April 2003, at the time such decisions

were made. (Id. at 2)

### 2.    The July 3, 2002 Letter from the Defendants' Counsel that Provided Additional and Detailed Written Notice to the Plaintiff

By a letter dated July 3, 2002, Attorney Richardson again wrote Chardavoyne's counsel.

(Richardson Aff. ¶ 3 & Ex. B thereto) With regard to the notice issue, the July 3 letter stated as

follows:

> ...When the Company gave Mr. Chardavoyne a draft of a
> separation agreement on May 29, 2002, it gave him actual notice of
> its termination of his employment with immediate effect. In case

Mr. Chardavoyne had any doubt as to the Company's intent, my letter to you dated June 10, 2002 plainly stated as follows:

> The Company's communication of its intention to terminate his employment without cause in conjunction with its separation agreement offer initiated the beginning of the notice period if the parties reached no separation agreement. Consequently, absent such an agreement, Mr. Chardavoyne's employment ends on May 29, 2003.

(Id. at 1)

### D.    The Plaintiff's Purported Resignation In December 2004

By a letter dated December 10, 2004 and sent to Alexander in London, Chardavoyne purported to resign "effective immediately" from all positions he held with Thames Water. (Ex. 11, Pl.'s 12/10/04 Letter)  The letter did not address any of the previous correspondence or actions since the May 29, 2002 meeting.  It also did not address the six months' written notice that Chardavoyne was obligated to provide under paragraph 11.1(b) of the Employment Agreement.

### E.    TWH's And TWNA's Ratification Of The Removal Of The Plaintiff From All Positions

On December 8, 2005, the shareholders and board of directors of both TWH and TWNA passed resolutions approving and ratifying the removal of Chardavoyne from all positions held by him. (Ex. 12, Patrick Aff. ¶¶ 2-5 & Exs. A-D thereto)  They also approved the actions of Alexander, McGivern, Huckin and Attorney Richardson in carrying out the removal of Chardavoyne from any and all positions with TWH and TWNA, including any positions as an officer or director.  (Id.)  These resolutions are consistent with the terms of TWH's and TWNA's By-Laws regarding the removal of officers and directors.  (Ex. 13, TWH's By-Laws, at 11; Ex. 14, TWNA's By-Laws, at 4-5, 8)

## II.    THE PLAINTIFF'S CLAIMS

The Second Amended Complaint contains five counts.  In the first count, Chardavoyne alleges that the defendants breached the Employment Agreement.  In sum, he bases his claim on: (1) an alleged failure of the defendants to provide written notice under paragraph 11.1(a) of the Employment Agreement; (2) the defendants alleged failure to pay him 872 shares of RWE AG stock granted pursuant to an Award Notice, dated March 27, 2002, under the Thames Water/RWE Long Term Incentive Plan ("LTIP"); and (3) miscellaneous complaints, based on alleged conduct by the defendants after the May 29 meeting.

By the second count, Chardavoyne asserts a claim for the breach of the implied covenant of good faith and fair dealing.  In the third count, Chardavoyne alleges a violation of Conn. Gen. Stat. § 31-72.  He seeks double his wages for the period between June 6, 2003 and December, 2004.  By the fourth count, Chardavoyne asserts a claim for violation of Conn. Gen. Stat. §§ 31-72 and 31-76k.  He claims that the defendants owe and have not paid him fringe and employee benefits for his services after June 30, 2003, including dental and medical insurance.  By the fifth count, Chardavoyne asserts a claim for conversion.  Specifically, he alleges that the defendants deprived him of the 872 shares of RWE AG stock that were referenced in the first count.

### STANDARD OF REVIEW

In Celotex Corp. v. Catrett, 477 U.S. 317 (1986), the Court examined the standard for summary judgment under Rule 56.  It recognized that the "plain language of Rule 56(c) *mandates* the entry of summary judgment, … against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which the party will bear the burden of proof at trial.  In such a situation, there can be 'no genuine issue as to any material fact,' since a complete failure of proof concerning an essential element of the

non-moving party's case necessarily renders all other facts immaterial." Id. at 322-23 (emphasis added). The moving party only bears the initial responsibility of informing the district court of the basis for its motion, identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrates the absence of a genuine issue of material fact. Id. 323.[2] There is, however, no express or implied requirement in Rule 56 that the moving party support its motion with affidavits or other similar materials negating the opponent's claim. Celotex, 477 U.S. at 323. Accordingly, the moving party is entitled to summary judgment when the non-moving party has failed to make a sufficient showing on an essential element of his case with respect to which he has the burden of proof. Id. at 323.

## ARGUMENT

### I.    THE COURT SHOULD ENTER SUMMARY JUDGMENT ON THE BREACH OF CONTRACT CLAIM

#### A.    All Claims Against TWNA Fail As A Matter of Law Because It Was Not A Party To The Employment Agreement

Under Pennsylvania law, in order to establish a claim for breach of contract, a party must demonstrate: (1) the existence of a contract, including its essential term; (2) a breach of a duty imposed by the contract; and (3) resultant damages. Corestates Bank, N.A. v. Cutillo, 723 A.2d 1053, 1058 (Pa. Super. 1999); Kalina v. Donato, 1998 WL 1107336, at *3 (Pa. Com. Pl. Apr. 3, 1998), aff'd 734 A.2d 444 (Pa. Super. 1998). See In re K-Dur Antitrust Litig., 338 F.Supp.2d 517, 548-49 (D.N.J. 2004) (applying Pennsylvania law). "It is fundamental contract law that one cannot be liable for breach of contract unless one is a party to that contract." Electron Energy

---

[2]/    Thus, "as to issues on which the non-moving party bears the burden of proof, the moving party may simply point out the absence of evidence to support the nonmoving party's case." Nora Beverages, Inc. v. Perrier Group of America, Inc., 164 F.3d 736, 742 (2d Cir. 1998).

Corp. v. Short, 597 A.2d 175, 177 (Pa. Super. 1991), aff'd 618 A.2d 395 (Pa. 1993). See Surya

Sys., Inc. v. Sunko, 2005 WL 1514225, at *2 (E.D.Pa. June 24, 2005) (no person can be sued for

breach of contract unless he is a party to the contract); Fleetway Leasing Co. v. Wright, 697 A.2d

1000, 1003 (Pa. Super. 1997) (same); id. at 1004 (affirming grant of summary judgment).

In the instant case, the Employment Agreement was **between** TWH and Chardavoyne.

(Employment Agreement, at 1; see id. (defining TWH as the "Company" under the agreement)

There was no agreement between TWNA and Chradavoyne. Accordingly, the Court should

enter summary judgment in favor of TWNA on all claims asserted against it in the Second

Amended Complaint.

**B.    The Written Notice Requirement Under The Employment Agreement Was Satisfied As A Matter Of Law**

Chardavoyne's claim regarding an alleged breach of the notice provision in paragraph

11.1(a) of the Employment Agreement is without merit. Under Pennsylvania law, the

interpretation of any contract is a question of law. Abbott v. Schnader, Harrison, Segal & Lewis,

LLP, 805 A.2d 547, 553 (Pa. Super. 2002), appeal dismissed 827 A.2d 1200 (Pa. 2003). See M.

Berger Co. v. United States, 199 F.Supp. 22, 25 (W.D.Pa. 1961) (the question of whether there is

a breach of contract is a question of law). In interpreting a contract, the ultimate goal is to

ascertain and give effect to the intent of the parties as reasonably manifested by the language of

their written agreement. Abbott, 805 A.2d at 553.    See Philadelphia Orchestra Ass'n v. Walt

Disney Co., 821 F.Supp. 341, 345 (E.D.Pa. 1993); Rusiski v. Pribonic, 515 A.2d 507, 510 (Pa.

1986) ("the intent of the parties to a contract is to be determined solely by the express language

contained therein."). When construing agreements involving clear and unambiguous terms, the

court need only examine the writing itself to give effect to the parties' understanding. Abbott,

805 A.2d at 553. A court must construe the contract only as written and may not modify the

plain meaning under the guise of interpretation. Id. Further, a court is "obliged to adopt an interpretation of the contract that is reasonable and probable in light of the parties' intent." In re Cornell Co., Inc., 2000 WL 388838, at *7 (Bankr. E.D.Pa. Apr. 12, 2000).

In the case at bar, an analysis of Chardavoyne's breach of contract claim demonstrates that the entry of summary judgment in favor of TWH and TWNA is appropriate. Contrary to Chardavoyne's allegations, a review of the language in the May 29 letter and the proposed separation agreement reveals that they satisfied the "written notice" requirement under paragraph 11.1(a). Chardavoyne's allegations notwithstanding, the letter does not state that he was terminated immediately, but rather, states that "with immediate effect your services are no longer required by the company." Moreover, the language that Chardavoyne appears to argue should have been in the notice, is not required under paragraph 11.1(a). The paragraph only requires "written notice." Thus, any complaints about the wording of the letter do not provide grounds for a breach of contract claim.

The letter and separation agreement provided to Chardavoyne at the May 29 meeting satisfied the "written notice" provision. As discussed in detail above, the letter and agreement informed Chardavoyne that he was being given notice on May 29, 2002 that his job was being eliminated and that unless a separation agreement was entered into, the terms of the Employment Agreement would govern. Chardavoyne's claims of confusion notwithstanding, his version of the May 29 meeting and his subsequent actions confirm that he received notice at the meeting and through the written materials he was provided. (See supra, Statement of Facts, §§ I.B.4-5) Specifically, during his deposition, he conceded numerous points that demonstrate that he received notice of the elimination of his employment at the May 29 meeting. For example, he testified that he was asked not to come into the office after May 29, 2002 and that he respected

17

that request. (Pl.'s Depo. Tr. at 30)  He further testified that during the May 29 meeting, he

inquired about obtaining a letter of recommendation from Alexander and about outplacement

assistance.  (Pl.'s Depo. Tr. at 92, 98-100, 103-04; Ex. 8 (Pl.'s notes))  He needed that letter in

order to be able to get another job. (Pl.'s Depo. Tr. at 103-04)  Chardavoyne further testified that

he was aware that after May 29, 2002, the locks for his office in New Jersey were changed.  (Id.

at 108-09)  Shortly after the May 29 meeting, he returned corporate credit cards and a corporate

telephone card in response to a request from Huckin. (Id. at 115)

Moreover, the June 10 and July 3, 2002 letters from Attorney Richardson supplemented

the May 29 letter and proposed agreement and leave no doubt that Chardavoyne received written

notice that his employment had been eliminated and that he would only be receiving wages and

benefits for twelve months thereafter.  (See supra, Statement of Facts, §§ I.C.1-2)  Consequently,

TWH and TWNA are entitled to summary judgment on Chardavoyne's claim of breach of the

notice provision and all of the related claims.

The analysis in Desimone v. Coatesville Area Sch. Dist., 248 F.Supp.2d 387 (E.D.Pa.

2003) confirms that the May 29 letter and the separation agreement satisfied paragraph 11.1(a).

In Desimone, the court granted summary judgment for the employer, a school district, on an

employee's claim that the school district breached its contractual agreement to provide him with

30 days' written notice of termination.  The plaintiff, an acting school superintendent, maintained

that a letter from the school district did not provide 30-day notice of a termination as required

under contract, because the letter did not specifically state that the board of directors for the

school district had terminated the plaintiff, or would do so in the future.  Consequently, the

plaintiff in Desimone contended that his contract was not properly terminated, and continued to

run for its entire one year period.

18

The <u>Desimone</u> court rejected the plaintiff's claim. It concluded that although the board's letter did "not use the buzz word 'termination' or specifically state that it constitutes the contractually required 30-day notice of termination," the letter "nonetheless provided [the plaintiff] with unambiguous notice that the contractual relationship between the parties was at an end." <u>Id.</u> at 393. The letter advised the plaintiff that the board decided to construe his decision to take inactive status as a "'resignation'" and that his services were deemed "'concluded'" as of November 30, 2002. <u>Id.</u> Further, the letter stated that the board was considering offering the plaintiff a "'severance in lieu of any and all claims against the district.'" <u>Id.</u> The court concluded that the language in the board's letter, "all of which explicitly references the reasons for, and the mechanics of, ending an employment relationship," rendered the letter effective written notice of termination. <u>Id.</u>

Here, the notice provided in the May 29 letter and the proposed separation agreement satisfied the standard articulated in <u>Desimone</u>. They provided Chardavoyne with the "written notice" called for under paragraph 11.1(a) of the Employment Agreement. The June 10 and July 3 letters supplemented that notice. Accordingly, summary judgment should be entered in favor of TWH and TWNA.

## C.    The Plaintiff's Lack Of Notice Claim Fails As A Matter Of Law

### 1.    Pennsylvania Law Supports the Entry of Summary Judgment

Even assuming for the sake of argument that the Court concludes that written notice was not satisfied, Chardavoyne's claim based on an alleged violation of the written notice provision is without merit under the governing case law and the undisputed facts. There are two leading cases addressing the issue of notice under Pennsylvania law, which governs under the choice of law provision in the Employment Agreement. They are <u>Massachusetts Bonding & Ins. Co. v.</u>