IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| DAVID E. CHARDAVOYNE<br>Plaintiff, | : | CIVIL ACTION NO.<br>3:03-CV-56 (WWE) |
| | : | |
| VS. | : | |
| | : | |
| THAMES WATER HOLDINGS<br>INCORPORATED, THAMES WATER<br>NORTH AMERICA, INC.<br>Defendants. | :<br>:<br>:<br>: | DECEMBER 16, 2005 |

### DEFENDANTS' LOCAL RULE 56(a)1 STATEMENT IN SUPPORT OF THEIR MOTION FOR SUMMARY JUDGMENT

Pursuant to Local Rule 56(a)1, the defendants, Thames Water Holdings Incorporated ("TWH") and Thames Water North America, Inc. ("TWNA"), submit this statement of undisputed facts in support of their motion for summary judgment. The statement also includes those allegations and statements by the plaintiff that, although TWH and TWNA may not agree with, can be considered for purposes of the motion and support the entry of summary judgment in favor of the defendants.[1] A separate appendix of exhibits (1 through 18) contains the exhibits cited below and in the defendants' memorandum of law.

Specifically, the defendants maintain that the following material facts are not disputed for purposes of the motion for summary judgment:

1.    TWH and the plaintiff entered into an Employment Agreement on or about January 15, 1999. (Ex. 1, Employment Agreement, at 1; see Second Am. Compl., Ex. A)  The agreement was "between" TWH and the plaintiff. (Ex. 1, Employment Agreement, at 1, see id. (defining TWH as the "Company" under the agreement))

---

[1]    TWH and TWNA reserve the right to challenge the truth of the plaintiff's allegations and statements at trial, if necessary.

2.  During his employment, the plaintiff was to perform such duties "in relation to the business of the Parent Company as may from time to time be vested in or assigned to him by his Line Manager" and he was required to "in all respects comply with the reasonable directions given by or under the authority of his Line Manager." (Ex. 1, Employment Agreement, at 2, ¶ 2.4) James McGivern was identified as the plaintiff's "Line Manager" and he held that role throughout the plaintiff's employment with TWH. (Id. at 1, ¶ 1.1; Ex. 7, Pl.'s Depo. Tr. at 94-95)

3.  Under paragraph 2.5 of the Employment Agreement, the plaintiff was required to, "without further remuneration," carry out duties on behalf of any other Group Company for as long as required by the Chief Executive. (Ex. 1, Employment Agreement, at 2, ¶ 2.5) William Alexander was identified as the Chief Executive under the Employment Agreement. (Id. at 1, ¶ 1.1)

4.  Under paragraph 5.4, TWH reserved the right "to change, modify or cancel at its sole discretion from time to time any or all of [the] benefits [promised to the plaintiff]." (Id. at 3)

5.  Under paragraph 7, TWH promised to provide the plaintiff "with a car for his use in the business of the Company or any Group Company...." (Id. at 3)

6.  Paragraph 11 of the Employment Agreement established a notice period in connection with the termination of the plaintiff. Specifically, it provided as follows:

> 11.1 Save as provided for in Clauses 12.1, 12.2 and 12.3 below, the Executive's employment hereunder shall continue subject to the terms of this Agreement until terminated.
>
>> (a) by the Company giving to the Executive not less than twelve months' written notice expiring at any time; or

> (b) by the Executive giving not less than six months' written notice expiring at any time.

(Ex. 1, Employment Agreement at 4)

7. Paragraph 13 of the agreement identified the plaintiff's duties upon his termination. (Ex.1, Employment Agreement, at 5-6) Under paragraph 13.1, upon his termination for any reason, the plaintiff was required to "forthwith resign from any offices held by him the Company or any other Group Company...." (Id. at 5) The plaintiff was further required under paragraph 13.2 to deliver to the Company "all correspondence, documents, specifications, papers, magnetic disks, tapes or other software storage media, credit cards, petrol cards, and other property belonging to the Company or any other Group Company," which may have been in his possession or control. (Id. at 6) Under paragraph 13.3, upon his termination, the plaintiff was required to "immediately return to the Company in good condition any car provided to him pursuant to Clause 8 above and any other communication or computing equipment and peripheral devices belonging to the Company." (Id.)

8. Paragraph 14 provided that "[t]he Chief Executive may at any time during the term of the [plaintiff's] employment hereunder elect not to provide work for the [plaintiff] to do and/or require the [plaintiff] not to attend at the premises of any Group Company and no such event shall constitute a repudiation of this Agreement or dismissal of the [plaintiff] whether constructive or otherwise." (Ex. 1, Employment Agreement, at 6)

9. Paragraph 24 of the Employment Agreement contained a choice of law provision. It provided that the agreement "shall be governed by and constructed in accordance with the laws of the Commonwealth of Pennsylvania." (Id. at 10)

10. In May, 2002, Alexander was the Chief Executive of Thames Water Plc, the parent company under the Employment Agreement. (Ex. 2, Alexander Depo. Tr. at 10; Ex. 1,

3

Employment Agreement, at 1, ¶ 1.1 ) Matthew Huckin was the Director for Human Resources for the Americas Region of Thames Water Plc. (Ex. 3, Huckin Depo. Tr. at 15) In addition to being the plaintiff's Line Manager, McGivern was the chairman of TWNA's board of directors. (Ex. 4, McGivern Depo. Tr. at 18-19; Ex. 7, Pl.'s Depo. Tr. at 135)

11. Prior to May 29, 2002, Alexander had conversations with McGivern, Huckin, and others regarding the termination of the plaintiff. (Ex. 2, Alexander Depo. Tr. at 21-22; Ex. 3, Huckin Depo. Tr. at 61-62; Ex. 4, McGivern Depo. Tr. at 61-63) McGivern kept Alexander informed regarding the situation with the plaintiff. (Ex. 4, McGivern Depo. Tr. at 63-64) In particular, McGivern discussed the general terms of dismissing the plaintiff and attempting to reach an agreement whereby the plaintiff would leave his employment with immediate effect. (Id. at 64-65) McGivern continued to update Alexander regarding the situation with the plaintiff following a May 29, 2002 meeting, at which the plaintiff was given written notice of termination. (Id. at 91-94)

12. Alexander approved the termination of the plaintiff's employment. (Ex. 2, Alexander Depo. Tr. at 22-23) The decision to terminate the plaintiff was made in connection with a forthcoming closing of a merger and as a result of dissatisfaction with the plaintiff's performance. (Ex. 3, Huckin Depo. Tr. at 63-64)

13. On May 29, 2002, McGivern and Huckin met with the plaintiff at his office in Voorhees, New Jersey. (Ex. 3, Huckin Depo. Tr. at 116; Ex. 7, Pl.'s Depo. Tr. at 88-90)

14. During the meeting, the plaintiff was provided with a notice of termination letter and a proposed separation agreement. (Ex. 3, Huckin Depo. Tr. at 118; Exs. 5 (Huckin's 5/29/02 Letter) & 6 (Proposed Separation Agreement); see Second Am. Compl., Exs. B-C)

15.   The letter provided to the plaintiff at the May 29 meeting stated, in relevant part, as follows:

> It is with regret that I must confirm that with immediate effect your services are no longer required by the company.
>
> A written separation agreement accompanies this letter. You have the right to consult your own lawyer for advice about the agreement....
>
> ...

(Ex. 5; see Second Am. Compl., Ex. B)

16.   TWH was included among the entities listed in the definition of the word "Company" in paragraph 1.01 of the proposed separation agreement. (Ex. 6, Proposed Separation Agreement; see Second Am. Compl., Ex. C)

17.   Paragraph 2.01 of the proposed separation agreement acknowledged that the plaintiff was retained as the president of TWH on February 15, 1999. (Ex. 6, Proposed Separation Agreement; see Second Am. Compl., Ex. C) It noted that when his employment "ended," he held that same position. (Id.) Paragraph 2.02 stated that on May 29, 2002, the Company told the plaintiff "of its elimination of his position." (Id.) It further stated that:

> the employment agreement between the Parties requires the Company to give the [plaintiff] 12 months' advance notice of the termination of his employment for reasons other than cause. It further allows the Company to assign no duties to the [plaintiff] during the notice period. The Parties' employment agreement also prohibits the [plaintiff] from having any other employment during the notice period. It further imposes restrictions on the [plaintiff's] competitive activities for an additional period of 12 months after the notice period ends.

(Id.)

18.   Paragraph 2.03 of the proposed separation agreement provided that the agreement will restructure the parties' obligations "in view of the elimination of the [plaintiff's] job." (Ex.

5

6, Proposed Separation Agreement; see Second Am. Compl., Ex. C) The separation agreement "abandon[ed] the notice period to terminate the [plaintiff's] employment and allow[ed] him to have non-competitive employment immediately." (Id.) Paragraph 2.03 also noted that the separation agreement's settlement sum provided enhanced economic benefits to the plaintiff as compared to the termination of his employment with notice pursuant to the Parties' employment agreement. (Id.)

19. Paragraph 3.03 of the separation agreement provided that in addition to severance pay in an amount equal to one year's salary, $227,000, the plaintiff was to receive a check in the amount of $50,000 less withholding, as a lump sum. (Ex. 6, Proposed Separation Agreement; see Second Am. Compl., Ex. C)

20. Paragraph 3.06 of the proposed separation agreement stated that:

> the Company has eliminated the [plaintiff's] job effective the close of business on May 29, 2002. Simultaneously with the elimination of the [plaintiff's] position as President of Thames Water Holding Incorporated, the Company has removed him from each of the officer and director's positions that the [plaintiff] held within the Company. In addition, the Company has revoked the [plaintiff's] authority to represent the Company in the capacity of an officer or a director of any committee or organization outside the Company. .... After May 29, 2002, the [plaintiff] shall neither speak nor act, or both, as the Company's representative without prior written authorization to do so from the Chief Executive Officer of Thames Water, Plc.

(Ex. 7, Separation Agreement; see Second Am. Compl., Ex. C)

21. Paragraph 3.19 of the proposed separation agreement provided that if the plaintiff had not already done so, he was required to return to the Company all business property in his possession, including credit cards and keys. (Id.) Paragraph 3.20 provided that with regard to the vehicle provided to the plaintiff for business-related use, during his employment, the plaintiff would be allowed to use that car until July 31, 2002, at which time he was to return it. (Id.)

6

22. Paragraph 5.01 acknowledged that the release contained within the agreement related to all claims concerning either the plaintiff's "employment with the Company or such employment's termination, or both." (Id.)

23. McGivern was the plaintiff's Line Manager and his authority over the plaintiff was defined by the Employment Agreement. (Ex. 7, Pl.'s Depo. Tr. at 94-95)

24. The plaintiff acknowledges that during the May 29, 2002 meeting, he did ask McGivern and Huckin whether there was "a provision for a recommendation from Bill Alexander" and whether there were "any outplacement services provided [for] in this agreement?" (Ex. 7, Pl.'s Depo. Tr. at 98) He maintains that the answer to both questions was no. (Id.) He further maintains that based upon these two answers, he knew that the agreement he was being offered "was not better than what [he] had,...and at that point [he] shut up." (Id.)

25. The plaintiff testified that based on his experience as a senior executive who had had to release vice presidents, "one of the things that you always put in an agreement is you try to help the person to the next job, you put in outplacement, letters of recommendation. If there isn't a fit, you know, especially with an individual who has gotten bonuses every year, salary increases every year, you know, great glowing words, if you're structuring some sort of agreement, you would put those in as a matter of course." (Ex. 7, Pl.'s Depo. Tr. at 99)

26. During the May 29, 2002 meeting, the plaintiff took notes. In those notes, he wrote that he needed to receive a letter of recommendation from Alexander. (Ex. 7, Pl.'s Depo. Tr. at 92, 103-04; Ex. 8, Pl.'s Notes) He needed a letter of reference in order to be able to get another job. (Ex. 7, Pl.'s Depo. Tr. at 92)

27. The plaintiff also acknowledges that during the May 29, 2002 meeting, Huckin discussed the fact that the agreement he was being provided with would allow him to keep his

7

company car for two months. (Ex. 7, Pl.'s Depo. Tr. at 99-100) The plaintiff further maintains that during the May 29 meeting, he was instructed not to return to the Voorhees office while he was reviewing the document he was given during the meeting. (Id. at 107) The plaintiff further maintains that McGivern and Huckin wanted the plaintiff to take his personal items out of his office and not to come back. (Id.)

28.  After the May 29, 2002 meeting, the plaintiff took a few personal items out of his office. (Ex. 7, Pl.'s Depo. Tr. at 106) Although the plaintiff maintains that Huckin did not have the authority to write the letter that was provided to him at the May 29 meeting, he testified at his deposition that he did not return to his office in Voorhees because he knew that the locks had been changed so he could not get into the office. (Id. at 108-09) He further maintains that after speaking with his attorney on May 30, 2002, he did not return to work based upon the advice of his counsel. (Id. at 109)

29.  On June 10, 2002, the plaintiff, in response to a request from Huckin, mailed Huckin two credit cards and a telephone card that had been provided as part of his employment. (Ex. 9, Pl.'s 6/10/02 Letter; Ex. 7, Pl.'s Depo. Tr. at 115) He returned the cards because the company wanted them back. (Ex. 7, Pl.'s Depo. Tr. at 115-16)

30.  Despite requests that the company car be returned, the plaintiff did not return it. (Ex. 7, Pl.'s Depo. Tr. at 116, 157) He did not return the car because he maintains that it was provided for under his Employment Agreement and he was still an employee. (Id. at 116) With regard to the Employment Agreement's provision for a car to be provided to the plaintiff "for his use in the business of the Company...," the plaintiff maintains that during the period after the May 29, 2002 meeting, he "was operating under section 14 of the agreement,...." (Id. at 117-18; See id. at 119)

31. With regard to the duties he performed as an employee of TWH after the May 29, 2002 meeting, the plaintiff alleges that he attended industry conferences and took Spanish lessons in Costa Rica. (Ex. 7, Pl.'s Depo. Tr. at 119-20) After May 29, 2002, the plaintiff does not recall performing any duties or providing any services as a director of either TWH or TWNA. (Id. at 138)

32. On June 10, 2002, Gerald M. Richardson, Esq., counsel for the defendants, wrote the plaintiff's counsel in response to the plaintiff's rejection of the separation agreement and his counter-proposal. (Ex. 10, Richardson Aff. ¶ 2 & Ex. A thereto) The June 10 Letter acknowledged that the plaintiff had the right to reject the offer. (Id.) However, it reminded the plaintiff's counsel that that decision would leave the plaintiff in the position of his having his employment terminated without cause pursuant to the Employment Agreement. (Id.)

33. Moreover, the June 10 letter reminded the plaintiff's counsel that under the agreement, TWH had the unqualified right to terminate the plaintiff without cause upon giving him 12 months' advance notice. (Ex. 10, Richardson Aff. ¶ 2 & Ex. A thereto) It further reminded the plaintiff's counsel that "the Company's communication of its intention to terminate [Mr. Chardavoyne's] employment without cause in conjunction with its separation agreement offer initiated the beginning of the notice period if the parties reached no separation agreement. Consequently, absent such an agreement, Mr. Chardavoyne's employment ends on May 29, 2003." (Id.) The June 10 Letter further stated that:

> [t]he Agreement,...allows the Company to provide no work to Mr. Chardavoyne and to require him to stay away from its premises in its non-tenants provisions. Assuming the absence of a separation agreement, then the Company began its exercising of its rights pursuant to the Agreement's non-attendance provisions effective May 29, 2002. On that date, the Company clearly communicated its elimination of Mr. Chardavoyne's job, which left him with no duties to perform. In addition, it told him of its expectation for him

9

to remove his personal belongings from the Company's premises and to return all of the company's property in his possession or under his control.

(Id.)

34.  The June 10 Letter expressly advised the plaintiff's counsel in detail of what would happen if no separation agreement was entered into by the parties. (Ex. 10, Richardson Aff. ¶ 2 & Ex. A thereto, at 1-3) For example, it indicated that the plaintiff would receive his base salary at the rate of $227,000 annually less all withholding through May 29, 2003 and his benefits. (Id. at 1-2; see id. at 2 ("Mr. Chardavoyne will receive payments equal to his salary for one year, and he will have no duties.")) It further indicated that the plaintiff would have to take his accrued vacation time "during the notice period" and that he would be considered for a bonus in April 2003, at the time such decisions were made. (Id. at 2)

35.  By a letter dated July 3, 2002, Attorney Richardson again wrote the plaintiff's counsel. (Ex. 10, Richardson Aff. ¶ 3 & Ex. B thereto) With regard to the notice issue, the July 3 letter stated as follows:

> ...When the Company gave Mr. Chardavoyne a draft of a separation agreement on May 29, 2002, it gave him actual notice of its termination of his employment with immediate effect. In case Mr. Chardavoyne had any doubt as to the Company's intent, my letter to you dated June 10, 2002 plainly stated as follows:
>
>> The Company's communication of its intention to terminate his employment without cause in conjunction with its separation agreement offer initiated the beginning of the notice period if the parties reached no separation agreement. Consequently, absent such an agreement, Mr. Chardavoyne's employment ends on May 29, 2003.

(Id.)

10

36. By a letter dated December 10, 2004 and sent to Alexander in London, the plaintiff purported to resign "effective immediately" from all positions he held with Thames Water. (Ex. 11, Pl.'s 12/10/04 Letter)

37. On December 8, 2005, the shareholders and board of directors of both TWH and TWNA passed resolutions approving and ratifying the removal of the plaintiff from all positions held by him. (Ex. 12, Patrick Aff. ¶¶ 2-5 & Exs. A-D thereto) They also approved and ratified the actions of Alexander, McGivern, Huckin and Attorney Richardson in carrying out the removal of the plaintiff from any and all positions with TWH and TWNA. (Id.) The resolutions were consistent with terms of TWH's and TWNA's bylaws. (Ex. 13, TWH's By-Laws, at 11, Ex. 14, TWNA's By-Laws, at 4-5, 8)

38. The Award Notice dated March 27, 2002 regarding the conditional award of 872 shares of RWE AG stock to the plaintiff was executed by and was from Thames Water Plc. (Ex. 15, 3/27/02 Award Notice)

39. Voorhees, New Jersey was where the plaintiff worked. (Ex. 7, Pl.'s Depo. Tr. at 90; see Ex. 18, (Pl.'s Bus. Card)) The location of his employment changed from Connecticut to Voorhees, New Jersey as of January 4, 2002. (Ex. 7, Pl.'s Depo. Tr. at 56-57)

40. The plaintiff was never denied any of his rights under the Consolidation Budget Reform Act of 1985 ("COBRA") by the defendants. (Ex. 7, Pl.'s Depo. at 148-49)

41. The plaintiff received all the wages and benefits due him under the Employment Agreement between May 29, 2002 and May 29, 2003. (Second Am. Compl., Count III, ¶ 47. Count IV, ¶ 50) He also received wages for the first week of June, 2003 and benefits through June 30, 2003. (Id.)

11

Respectfully submitted,

THE DEFENDANTS
THAMES WATER HOLDINGS,
INCORPORATED and THAMES
WATER NORTH AMERICA, INC.

By: _____
Stephen P. Fogerty
CT Fed. Bar No. 01398
**HALLORAN & SAGE LLP**
315 Post Road West
Westport, Connecticut 06880
Tele: (203) 227-2855
Fax: (203) 227-6992
E-mail: Fogerty@halloran-sage.com

and

Ralph W. Johnson, III
CT Fed. Bar No. 15277
**HALLORAN & SAGE LLP**
One Goodwin Square
225 Asylum Street
Hartford, CT 06103
Tele: (860) 522-6103
Fax: (860) 548-0006
E-mail: Johnsonr@halloran-sage.com

Their Attorneys

## **CERTIFICATION**

This is to certify that on this 16th day of December, 2005, the foregoing was caused to be mailed, postpaid, to:

James R. Hawkins II, Esq.
William M. Tong, Esq.
Finn Dixon & Herling LLP
One Landmark Square, Suite 1400
Stamford, CT 06901-2689

_____
Ralph W. Johnson, III

747388_1 DOC