UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | |
|---|---|
| DAVID E. CHARDAVOYNE, ) | |
| ) | CASE NUMBER: |
| Plaintiff, ) | 3:03CV56 (WWE) |
| ) | |
| vs. ) | |
| ) | |
| THAMES WATER HOLDINGS ) | |
| INCORPORATED, and THAMES WATER ) | |
| NORTH AMERICA, INC., ) | |
| ) | |
| Defendants. ) | April 28, 2006 |

**MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS'
<u>MOTION FOR SUMMARY JUDGMENT</u>**

Plaintiff David E. Chardavoyne ("Chardavoyne" or "Plaintiff") submits this memorandum of law in opposition to defendants' Thames Water Holdings Incorporated ("Thames Holdings") and Thames Water North America, Inc. ("Thames North America," and collectively "Defendants") motion for summary judgment dated December 16, 2005.

The motion must be denied because there are genuine issues of material fact: *at no time prior to Plaintiff's resignation were James McGivern ("McGivern") or Matthew Huckin ("Huckin"), individually or collectively, authorized by Plaintiff's employment agreement or the Defendants' bylaws to terminate Plaintiff's employment or give notice of termination.* This central issue has been repeatedly raised by Plaintiff, before the litigation, in the original declaratory judgment complaint, in each subsequent amendment to the complaint and repeatedly throughout discovery. The settled applicable law is clear that conditions precedent to termination, including the form and content of notice, are to be strictly construed in favor of the employee.

Defendants fail even to address this central issue in their summary judgment motion. Among the many other genuine issues of material fact that preclude summary judgment are the following:

{00206438; 7; 1103-2}

(a) Plaintiff had a right to health and dental insurance, a right documented in his Employment Agreement which Defendants refused to pay after June 30, 2003 and threatened to stop Chardavoyne's option to pay for it himself under COBRA as of December 2004;

(b) Plaintiff had a right to vested shares of stock, acknowledged as due and owing by Huckin and Defendants' in-house counsel, but which remain undelivered and/or unpaid;

(c) Plaintiff had a right to a company car, expressly granted to him under his Employment Agreement, which Defendants allege as stolen despite Defendants' failure to report the vehicle as stolen, failure to repossess the vehicle as allowed by the Connecticut General Statutes and whose registration and insurance Defendants voluntarily renewed during such period; and

(d) Defendants engaged in a pattern of tortious conduct which was deliberate and in breach of Defendants' implied covenant to act in good faith and fair dealing under the Employment Agreement, including misrepresentations about a Draft Separation Agreement, threats regarding medical benefits, false accusations, unreasonable delay in payment of deferred compensation and failure to provide accurate W-2 reporting.

Also submitted in opposition to Defendants' motion are: (i) the affidavit of David E. Chardavoyne, dated April 27, 2006 (the "Chardavoyne Aff."); (ii) Plaintiff's appendix of documents from the record (the "App."); and (iii) Plaintiff's counterstatement of disputed facts.

## PRELIMINARY STATEMENT

Chardavoyne served as president and director of Thames Holdings and Thames North America, both corporations organized under the State of Delaware, until he resigned on December 10, 2004. Plaintiff was duly elected to those positions pursuant to a written employment agreement with Thames Holdings (the "Employment Agreement") and in accordance with Defendants' bylaws.

On May 29, 2002, Chardavoyne agreed to meet with McGivern and Huckin who unexpectedly attempted to coerce Plaintiff's resignation. Why? Tellingly, at the time, Defendants were in the midst of an acquisition and merger with American Water Works Company, then the largest American investor owned regulated water utility in the United States. At that time, Plaintiff

was the only officer working for Defendants who had experience running an investor owned regulated water utility in the United States.

The May 2002 meeting and events that followed were nothing other than a coup engineered by McGivern to eliminate competition for a position he coveted, leadership of the expanded American operations. McGivern, a British lawyer by background, had no experience running a regulated investor owned water utility in the United States. In fact, McGiven had no operating experience with any water utility or American company.

At the May 29 meeting, Chardavoyne was handed two documents, a letter signed by Huckin and an unsigned draft separation agreement. Huckin's letter falsely stated that with "immediate effect" Plaintiff's position had been eliminated. The draft separation agreement to the contrary said Plaintiff was entitled to one year's advance notice in writing of his termination. After the May 29, 2002 meeting, McGivern falsely reported to William Alexander and others that Plaintiff resigned. App., Ex. 39. Huckin later testified that McGivern's announcement of Chardavoyne's resignation was nothing more than their (Huckin's and McGivern's) attempt to "position" Chardavoyne's exit from the company. Finally, Defendants defaulted to their current position that Plaintiff was terminated. The problem for Defendants is that McGivern and Huckin were not authorized by Plaintiff's Employment Agreement or in accordance with Defendants' bylaws to terminate or give Chardavoyne notice of termination of his employment.

No other person or entity with authority ever gave notice of termination. The Employment Agreement and bylaws contain specific provisions for termination of Plaintiff, an officer and director of Defendants. The controlling provisions for termination under the Employment Agreement and for removal under the corporate bylaws were never followed.

The documents, discovery responses and sworn deposition transcripts in the record confirm the following:

(a) Chardavoyne did not resign his employment or his positions as president and director of Defendants until he submitted his resignation on December 10, 2004;

(b) Prior to his resignation, no person or entity with authority under the Employment Agreement or the bylaws ever gave notice of termination under that agreement;

(c) Prior to his resignation, Defendants never took any action in accordance with their Delaware corporate bylaws to remove, elect a successor or terminate Chardavoyne from his positions as president and director;

(d) As a line manager, a position with duties defined in the Employment Agreement, McGivern had no authority under the Employment Agreement or the bylaws to terminate Chardavoyne, an officer and director;

(e) William Alexander, the chief executive officer of the parent company of both Defendants at all relevant times, and also the person who signed the Employment Agreement on behalf of Thames Holdings, was unequivocal in his testimony that he expected all employees to live up to and honor the letter and spirit of the Employment Agreement; and

(f) Alexander was equally clear and unequivocal in his testimony that the Delaware corporate bylaws of the Defendants govern any action to be taken by Defendants and must be respected, and also that he never acts other than in compliance with the bylaws.

On the basis of the above and as detailed herein, summary judgment must be denied. Plaintiff is entitled to proceed to trial on the merits with respect to the claims of his Second Amended Complaint.

## SUMMARY STATEMENT OF CLAIMS

Defendants stopped paying Chardavoyne his wages after June 6, 2003. Defendants have not paid Chardavoyne employee benefits to which he is entitled, including without limitation dental and medical insurance after June 30, 2003.[1] Defendants continue to refuse to pay stock granted to him

---

[1] After June 30, 2003, Defendants allowed Chardavoyne to pay for his own medical and dental insurance, as required by the federal Consolidated Omnibus Budget Reconciliation Act (COBRA). Even so, Defendants attempted to terminate Chardavoyne's COBRA benefits prematurely and prior to the expiration of 18 months, the federal minimum. App., Ex. 1, Letter from Joanne Volk to Chardavoyne, dated November 3, 2004 ("November 3 Volk

pursuant to an award notice dated March 27, 2002. On the basis of these and other actions taken against him in bad faith, Chardavoyne commenced this action (first as an action for declaratory relief after being threatened to have compensation and benefits cut off and prior to his December 10, 2004 resignation) now seeking damages for: (i) breach of contract; (ii) breach of the implied covenant of good faith and fair dealing; (iii) failure to pay wages pursuant to CONN. GEN. STAT. § 31-72; (iv) failure to pay benefits pursuant to CONN. GEN. STAT. §§ 31-72 and 31-76k; and (v) conversion with respect to the wrongful withholding of stock.

## STATEMENT OF FACTS

The relevant facts, along with Plaintiff's separately filed D. CONN. L. CIV. R. 56(a)(2) statement detailing the disputed issues of material fact, are as follows:

### A.     THE EMPLOYMENT AGREEMENT

Defendants' ultimate parent company located in the United Kingdom, Thames Water Plc ("Thames Plc"), recruited Chardavoyne to run its U.S.-based water and wastewater businesses. Chardavoyne Aff. at ¶ 4. An Employment Agreement dated January 15, 1999, between Thames Holdings and Chardavoyne (the "Employment Agreement," as previously defined) details the terms of employment. App., Ex. 2.

According to the Employment Agreement, Chardavoyne was hired to serve as president of Thames Holdings, along with such other appointments directed by the "Chief Executive" of the British parent company, Thames Plc. The Employment Agreement identifies (i.e., defines) the "Chief Executive" to be William Alexander ("Alexander") of Thames Plc. See id. at §§ 2.1, 2.5. Chardavoyne was duly elected president and a director of Thames Holdings, a Delaware corporation,

---

Letter"); 29 U.S.C. § 1162(2)(A)(i). Although Defendants finally agreed to comply with the federal minimum, they nonetheless refused to extend Plaintiff's COBRA benefits even though such extension would have been at no cost to Defendants.

in accordance with the terms of its bylaws. Pursuant to the Employment Agreement, Chardavoyne was also elected president and a director of Thames North America, a Delaware corporation. Chardavoyne Aff. at ¶ 7.

### 1. Wages, Benefits And Incentive Compensation

The Employment Agreement provides that Chardavoyne was entitled to salary and bonus, as well as "conditional rights to shares under any incentive scheme." Employment Agreement at §§ 5.1, 5.2. Additionally, the Employment Agreement provides for "health, dental, life and long term disability insurance" and participation in a "retirement benefits plan." Id. at § 5.3. Pursuant to these provisions, Chardavoyne participated in:

(a) Thames Holdings' Non-Qualified Deferred Compensation Plan;[2] and

(b) various stock-based incentive schemes, including the Thames Water Plc Long Term Incentive Plan.[3]

The Employment Agreement entitled Chardavoyne to a company car, including maintenance and fuel. Id. at § 7.

### 2. Employment Agreement Provisions Regarding Termination

Chardavoyne's employment was to continue under the Employment Agreement until it automatically terminated "on his reaching 65 years of age." Id. at § 12.3.[4] Specific provisions govern termination by either party before that time. Section 11.1 of the Employment Agreement states:

> [T]he Executive's employment hereunder shall continue subject to the terms of this Agreement until terminated: (a) *by the Company* giving to the

---

[2] See App., Ex. 3, Retirement Advantage, Enrollment & Allocation Request, dated November 28, 1999.

[3] See App., Ex. 4, Letter from William Alexander to David Chardavoyne, dated March 28, 2002 (the "March 28 Alexander Stock Award Letter").

[4] Chardavoyne is not 65 years of age, so this provision is not an issue here. Chardavoyne Aff. at ¶ 3; see App., Ex. 37 (Second Amended Complaint at ¶ 16(h)).

> Executive not less than twelve months' written notice expiring at any time; or
> (b) by the Executive giving not less than six months' written notice expiring at any time.

Id. at § 11.1 (emphasis added). The "Company" is defined as "Thames Water Holding Inc."

Id. at § 1.

In addition to the Employment Agreement, the bylaws of Thames Holdings and Thames North America, both Delaware corporations, govern Chardavoyne's position as president and a director of each. Under Defendants' bylaws, action by the shareholders and the directors was a condition precedent to any removal of a person serving as a director or officer.

As to Thames Holdings:

> [Article II,] Section 2. <u>Number and Term of Office [Directors]</u>: The directors shall be elected at the annual meeting of the stockholders . . . *and each director shall hold office until his successor is elected and qualified.*
>
> [Article IV,] Section 3. <u>Succession.</u> The officers of the Corporation shall hold office *until their successors are elected and qualified.* Any officer elected or appointed by the Board of Directors *shall be removed at any time by the affirmative vote of a majority of the directors.*

See App., Ex. 5, Bylaws Thames Water Holdings Incorporated at §§ 5, 11 (emphasis added).

The bylaws of Thames North America also required formal action by majority shareholder vote (for the removal of a director) and decision by the board of directors (for the removal of an officer):

> Section 2.12. <u>Removal of Directors.</u> Any director may be removed at any time, either for or without cause, *upon the affirmative vote of the holders of a majority of the outstanding shares of stock* in the Corporation entitled to vote for the election of such Director.
>
> Section 4.04. <u>Removal and Resignation; Vacancies.</u> Any officer may be removed for or without cause *at any time by the Board of Directors.*

See App., Ex. 6, Bylaws Thames Water North America, Inc. at §§ 5, 8 (emphasis added).

-7-

For the period during Plaintiff's continued employment through the date of Plaintiff's resignation on December 10, 2004, it is undisputed that no such board or shareholder action ever occurred either to terminate Chardavoyne, remove him as an officer and director or to elect a successor. See Chardavoyne Aff. at ¶¶ 8-9; see also App., Exs. 7 and 8, Deposition Transcript of James McGivern, dated August 5, 2005 ("McGivern Dep. Tr.") at 102:103 and Deposition Transcript of Matthew Huckin, dated July 26, 2005 ("Huckin Dep. Tr.") at 101, respectively.

### B.    THE MAY 29, 2002 MEETING

As of May 2002, Chardavoyne had served faithfully under the Employment Agreement for more than three (3) years, repeatedly being commended and rewarded for his leadership of Defendants' expanding U.S. water and wastewater businesses. See App., Ex. 9, Chart of Commendations and Bonuses. On or about May 29, 2002, McGivern and Huckin, who represented themselves as the Managing Director of Thames Americas, and the Human Resources Director of Thames Americas, respectively, unexpectedly requested to meet with Chardavoyne. Chardavoyne Aff. at ¶ 11. It is not disputed that Thames Americas is not a legal entity nor is it a partnership or any other form of business entity organized under the laws of any state, foreign or domestic.[5] Additionally, there was no agreement, assignment, memorandum of understanding, or other document that grants Thames Americas authority within or without the Thames enterprise to act on behalf of Thames Plc, Thames Holdings or Thames North America.[6] Accordingly, Thames Americas has no legal or legitimate relationship to either Defendant Thames Holdings or Defendant Thames North America.

---

[5] See App., Ex. 8, Huckin Dep. Tr. at 101:10-24:
    Q.    Thames Water Americas is still not a legal entity, correct?
    A.    Not as far as I am aware.

[6] Id. at 113:18-114:1:
    Q.    So, just so the record is clear, you didn't have any Board authority from Thames Water Holdings or Thames Water North America[] [sic] to terminate Mr. Chardavoyne as an officer or a director on May 29, 2002, correct?
    A.    Correct.

{00206438; 7; 1103-2}

At that meeting, Huckin gave Chardavoyne a letter (the "May 29 Letter") and an envelope containing a draft agreement (the "Draft Separation Agreement").  See Chardavoyne Aff. at ¶ 12; App., Exs. 10 and 11, May 29 Letter and Draft Separation Agreement, respectively.  The May 29 Letter, signed by Huckin as Human Resources Director on Thames Americas letterhead, falsely states: "It is with regret that I must confirm that with immediate effect your services are no longer required by the company." App., Ex. 10.  The letter is not copied to any other person or entity.  The May 29 Letter goes on to reference an accompanying "written separation agreement," with a 21-day deadline of June 19, 2001 for Chardavoyne's consideration whether to accept it.  Id.

The Draft Separation Agreement was an unsigned document with a signature block for Huckin to sign and another signature block for Chardavoyne to sign as "Releasor."[7]  The Draft Separation Agreement purported to give Chardavoyne a "settlement sum" of severance in the amount of one-year's base pay.  In addition, the Draft Separation Agreement proposed a payment of $50,000, less withholding taxes, in exchange for:  (i) Chardavoyne's resignation; (ii) a release of claims; (iii) a commitment to non-disparagement; (iv) surrender and loss of nonvested amounts in two retirement plans; (v) a non-compete significantly broader in form than that contained in the Employment Agreement; and (vi) a shortening of the federally granted rights under COBRA.  The proposed payment of an "additional" $50,000 less taxes was, accordingly, of no benefit to Chardavoyne. Compare App., Ex. 11 (Draft Separation Agreement) with Ex. 2 (Employment Agreement).

During and after the meeting, Chardavoyne was confused by Huckin's and McGivern's conduct, and was at a loss to understand the meaning or effect of the May 29 Letter and the Draft

---

[7]Just as Huckin had no authority to issue a notice of termination to Chardavoyne, he was equally without authority to sign the Draft Separation Agreement, as he had no authority to speak or act on behalf of Thames Holdings.  See App., Ex. 19.

Separation Agreement.[8]  In a note to the file dated May 29, 2002, Huckin wrote that Chardavoyne was "shocked." See App., Ex. 12.  Only two months earlier, on or about March 28, 2002, Alexander — as Chief Executive of Thames Plc, Chardavoyne's direct superior pursuant to the Employment Agreement (see App., Ex. 2, Employment Agreement at §§ 1.1, 2.1, 2.3 and 2.5) — awarded Chardavoyne shares in the Thames Water Plc Long Term Incentive Plan.  Echoing sentiments expressed through prior awards and commendations, Alexander wrote:

> I am pleased to be able to advise you that a conditional award of 872 shares has been made to you.  The Long Term Incentive Plan aims to reward and recognise key people in the Company.

App., Ex. 4, Letter from William Alexander to David Chardavoyne, dated March 28, 2002 ("March 28 Alexander Stock Award Letter").  Attached to the March 28 Alexander Stock Award Letter was an award notice, which confirmed the award of 872 shares.  The vesting date of the award was July 26, 2004.  Similarly, by letter which Chardavoyne received on or about October 5, 2002, Huckin acknowledged Chardavoyne's right to the stock and promised to pay it.  App., Ex. 13.  On November 8, 2002, attorney Ari Levine ("Levine"), writing as Director of Legal Services, confirmed that the stock shares would be delivered.  App., Ex. 14.  To date, Chardavoyne has not received the shares.  Chardavoyne Aff. at ¶ 15.

    C.    **AFTERMATH OF THE MAY 29, 2002 MEETING**

By letter dated June 3, 2002, Huckin was informed that both the Draft Separation Agreement and the May 29 Letter were unacceptable, "because they are in violation of the Agreement in numerous material respects."  App., Ex. 16.  Attorney Gerald Richardson responded by letter dated June 10, 2002, purportedly on behalf of "Thames Water and its subsidiary companies in the

---

[8] See App., Ex. 15, Deposition Transcript of David Chardavoyne, dated September 2, 2005 ("Chardavoyne Dep. Tr.") at 96:13-15 (testifying that "I knew I was president of Thames Water Holdings Incorporated so I was confused as to what this discussion was about").