Americas Region." App., Ex. 17.[9] Attorney Richardson and his firm *were not retained as counsel to Thames Holdings or Thames North America.* They represented American Water Works Company in connection with the pending acquisition and merger. Their retention was not approved by Thames Holdings or Thames North America. Responses produced in discovery confirm that there is no engagement letter. See App., Ex. 18.

By letter dated July 12, 2002, Mr. Chardavoyne made clear through his counsel why he rightly remained employed by Defendants:

(a)  Notice of termination must be from Thames Holdings, defined as the "Company" under the Employment Agreement;

(b)  The May 29 Letter was from Thames Water Americas which is not, to Plaintiff's understanding, even a corporation incorporated in any state of the United States;

(c)  On or before May 29, 2002, Mr. Huckin was neither an officer nor director, not even an employee of the Company as defined in the Employment Agreement;

(d)  At that time, Thames Holdings had not delegated or appointed Thames Americas as agent for purposes of giving notice under the Employment Agreement;

(e)  Absent a provision in the bylaws to the contrary, the president of Thames Holdings (i.e., Plaintiff) may only be terminated by a vote of the Board of Directors of Thames Water Holdings; and

(f)  At no time prior to May 29, 2002 was there a meeting of the Board of Directors of Thames Water Holdings or any resulting resolution authorizing a notice of termination be given to Plaintiff pursuant to the Employment Agreement.

---

[9]Importantly, for purposes of defendants' motion, the Employment Agreement includes a section entitled "Non-Attendance," which provides:
> The Chief Executive may at any time during the term of the Executive's employment hereunder elect not to provide work for the Executive to do and/or require the Executive not to attend at the premises of any Group Company and *no such event shall constitute a repudiation of this Agreement or dismissal of the Executive whether constructive or otherwise.*

Id. at § 14 (emphasis added). Accordingly, the Employment Agreement specifically anticipated that Chardavoyne's directed absence from the office or office premise would not evidence termination.

App., Ex. 19. Defendants never responded to the July 12 Hawkins Letter or cited to any authority for the purported termination, although Defendants admit that Plaintiff has a right to know the source of authority for any notice of termination.[10]

On December 10, 2004, Chardavoyne resigned from Thames Holdings and Thames North America. In response, McGivern sent a letter to Chardavoyne on December 21, 2004, stating: "Lest there be any confusion on your part, on May 29, 2002 and at the direction of William Alexander, Matthew Huckin and I advised you verbally and in writing that your employment was being terminated and that your services were no longer required by the Company." App., Ex. 20. This was the first written communication by McGivern with regard to the May 29, 2002 meeting. Indeed, it was the first written communication by anyone on stationery of Thames Holdings with regard to this matter. Additionally, it was the first anyone ever communicated that Chardavoyne was being terminated "at the direction of William Alexander," a fact that Alexander denied at his deposition.[11]

In connection with their motion for summary judgment, Defendants submitted documents dated December 8, 2005 (one week prior to Defendants' postponed filing of their motion for summary judgment, and long after the close of discovery) which purport to reflect board and shareholder action to ratify the termination of Mr. Chardavoyne as an officer and director of Thames Holdings and Thames North America, effective May 30, 2003. App., Ex. 22. Chardavoyne had resigned.

---

[10] App., Ex. 8 (Huckin Dep. Tr. At 155:16-24-156:1-14).

[11] See App., Ex. 21, Deposition Transcript of William Alexander, dated August 24, 2005 ("Alexander Dep. Tr.") at 16:10-12.
    Q.    Did you ever issue any writing, in which you authorized the termination of David Chardavoyne?
    A.    Not to my knowledge.

a year prior to the purported ratification. Chardavoyne Aff. at ¶ 9. Alexander retired as Chief Executive of Thames Plc eight days earlier. App., Ex. 38.

## ARGUMENT

Neither Huckin nor McGivern ever had authority—real or apparent—to (i) eliminate Chardavoyne's positions as president and director; (ii) force Chardavoyne to resign; (iii) give notice of termination; or (iv) elect a successor. Accordingly, Chardavoyne remained employed until he submitted his resignation on December 10, 2004, as prior to that time there was never any notice from Thames Holdings (defined as the "Company" under the Employment Agreement) and never any board action or shareholder vote on behalf of Defendants to effect a removal.

The central issue of lack of authority is not mere formality, but a core requirement that must be respected in order to affect in any way Plaintiff's status as an employee, officer or director of defendants. While Defendants ignore this core requirement, this Court is not:

> [The employer-Defendants] incorrectly argues that [question of whether the Plaintiff-employee received notice of termination] is "mere semantics." In fact, the [question] is supported by legal precedent but also comports with logic and common sense. An employee could certainly be aware that a superior desired his termination . . . but not also know whether the supervisor had the authority to carry out the desired termination and therefore whether he would in fact be terminated.

Wolochuk v. Vollmer Assocs., No. 3:98CV01667, 2000 WL 1742699, at *2 n.2. (D. Conn. Nov. 1, 2000). In Wolochuk, the Court found genuine issues of fact as to whether the Defendants gave "definite official notice of termination," and whether "the partners who informed [Plaintiff] that he would be terminated actually had authority to speak for the entire [Defendants] partnership." Id. at *3. Likewise, in Monning v. Kennecott Corp., this Court found that the purported termination letter had a "tentative quality" that did not express whether it was the "official position" of the employer. 603 F. Supp. 1035, 1038 (D. Conn. 1985).

{00206438; 7; 1103-2}

By the July 12 Hawkins Letter, Chardavoyne clearly articulated his position that Huckin and McGivern had no authority to give notice of termination. McGivern, entirely without basis, falsely reported Chardavoyne had resigned. App., Ex. 19. Huckin later testified that the communication "describes the way we had chosen to position his departure." App., Ex. 8, Huckin Dep. Tr. at 151. After Chardavoyne's efforts to resolve the situation broke down and before filing the declaratory judgment action Chardavoyne wrote Alexander on December 6, 2002 to seek clarification as to his employment status. App., Ex. 23. By letter dated December 18, 2002, Alexander responded that he would have Timothy Boylin ("Boylin"), Director of Human Resources, "review the circumstances surrounding your exit from the business" to ensure Chardavoyne received "an appropriate response." App., Ex. 24. Chardavoyne followed up directly by letter to Boylin on January 8, 2003 to inquire further as to status. App., Ex. 25. By letter dated January 27, 2003, Boylin responded simply that he could not communicate with Chardavoyne by reason of the litigation. App., Ex. 26. Alexander later testified that he had never before seen the January 27 Boylin letter, which was written on Alexander's letterhead, noting that it was very unusual for Boylin to do so.[12] The ongoing result was "employment limbo," as Chardavoyne reported to Alexander in his December 6, 2002 letter, despite Chardavoyne's repeated efforts to clarify his position. App., Ex. 23.

## STANDARD OF REVIEW

The Court's role on summary judgment is preliminary in nature. "The very mission of the summary judgment procedure is to pierce the pleadings and to assess the proof in order to see whether there is a genuine need for trial." FED. R. CIV. P. 56 ADVISORY COMMITTEE'S NOTE (1963).

---

[12]See id. at 34:5-18.
```
Q.   Have you seen [Boylin's letter] before?
A.   I have not. This letter is unusual. It's on my letterhead, and it's signed by our group personnel
     director . . . .
Q.   It's unusual for your group HR director to write on your letter head?
A.   Very unusual. Very unusual.
```

{00206438; 7; 1103-2}

A dispute regarding a material fact is genuine "if the evidence is such that a reasonable jury *could* return a verdict for the nonmoving party." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986) (emphasis added); Pinto v. Allstate Ins. Co., 221 F.3d 394, 398 (2d Cir. 2000) (reversing district court's decision granting summary judgment because "in view of all the facts and circumstances" the record contained questions for a jury). As a result, the Court should not grant summary judgment when the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show:

    (a)    the existence of all essential elements on which Plaintiff bears the burden of proof at trial;

    (b)    the existence of a genuine issue of material fact; and

    (c)    that Defendants is not entitled to judgment as a matter of law because the evidence in the record could reasonably support a verdict for the Plaintiff.

FED. R. CIV. P. 56(c); see also Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986).

It is not the Court's role, on the other hand, to engage in determinations of credibility, weigh the evidence or resolve issues of fact; these tasks are reserved for the fact-finder. Lucent v. Int'l Bus. Mach. Corp., 310 F.3d 243, 254 (2d Cir. 2002) (vacating district court's decision granting summary judgment because court improperly resolved numerous factual discrepancies thereby "usurp[ing] jury's province as fact-finder"). Its function is "confined to decide whether a rational juror could reasonably support a jury's verdict for the non-moving party," thereby precluding entry of a judgment as a matter of law. Id.

Defendants, as the movants, bear the ultimate burden of demonstrating that no genuine issue of material fact exists. Adickes v. S.H. Kress & Co., 398 U.S. 144, 157 (1970); Gallo v. Prudential Residential Servs., L.P., 22 F.3d 1219, 1223-24 (2d Cir. 1994). To determine whether a genuine issue of material fact exists, this court must examine the evidence in the light most favorable to, draw all inferences in favor of and resolve all ambiguities in favor of the Plaintiff. See Matsushita Elec.

Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986); Weinstock v. Columbia Univ., 224 F.3d 33, 41 (2d Cir. 2000). It is axiomatic that "the evidence of the non-movant [Plaintiff] is to be believed." Anderson, 477 U.S. at 248.

I.  **PLAINTIFF WAS NEVER TERMINATED OR REMOVED FROM HIS POSITIONS AS AN OFFICER AND DIRECTOR IN ACCORDANCE WITH THE CORPORATE BYLAWS**

Chardavoyne knew that as president and a director of both Thames Holdings and Thames North America — both Delaware corporations — he could not be terminated without shareholder and director action pursuant to Defendants' bylaws. Defendants were equally and admittedly aware, as Alexander testified, that Defendants were bound to follow their bylaws.[13]

The terms of the bylaws for Thames Holdings and Thames North America, previously quoted and submitted herewith in full text, are clear and unequivocal: whether by removal or through succession, no person can be stripped of his or her position as an officer and director of both companies absent (i) a majority vote of the shareholders, and (ii) action by the board of directors.

As of May 29, 2003, Chardavoyne knew that no such action took place during his tenure since, as a member of the board of directors of both companies, he would have been given notice of a board meeting and vote. See Chardavoyne Aff. at ¶ 9. Defendants *concede* that such action never occurred during Plaintiff's tenure (i.e., prior to his resignation on December 10, 2004) by submitting board resolutions purporting to document action by the Defendants' respective boards and shareholders on December 8, 2005 to "confirm [], approve[] and ratif[y]the removal of David Chardavoyne from any and all positions held at the Corporation[s], including any positions as an

---

[13]See App., Ex. 21, Alexander Dep. Tr. at 11:4 - 13:12:
   Q. Do you know . . . what a charter and bylaws are of an American company?
   A. Yes. . . .
   Q. If [Thames Holdings] had a charter and bylaws, would you anticipate that . . . the company and the company officials were obligated to comply with the charter and bylaws?
   A. Yes.

officer or director." App., Ex. 22. If such action took place on December 8, 2005, *a fortiori* it did not occur earlier, and, accordingly, proves that Chardavoyne remained as president and a director up until the time of his resignation in December 2004. It similarly demonstrates that at no time prior to Chardavoyne's resignation were either McGivern or Huckin authorized to terminate him.

Defendants' argument that the December 2004 ratification relates back to May 29, 2002 is specious, contrived and directly contrary to controlling Delaware law. In fact, Defendants' concession that board and shareholder action as required by Delaware law did not occur until December 8, 2005 may be dispositive in Plaintiff's favor as to liability.[14] The December 8, 2005 ratification clearly proves that if McGivern and Huckin were authorized, prompt corporate action could have been readily obtained.

> A. **Delaware Law Controls On Issues Of Corporate Governance And The Requirement That Defendants Act In Accord With <u>The Bylaws Of The Corporate Entities</u>**

As to all issues of corporate governance in this case, the substantive law of Delaware controls. According to the clear dictates of Delaware law and the bylaws at issue, it is beyond question that Chardavoyne remained an officer and director of both Thames Holdings and Thames North America until his resignation in December 2004.

A court sitting in diversity looks to the law of the forum state in order to determine what law applies. <u>Fieger v. Pitney Bowes Credit Corp.</u>, 251 F.3d 386, 393 (2d Cir. 2001); see also <u>Erie Railroad v. Tompkins</u>, 304 U.S. 64 (1938) (district court sitting in diversity should apply law of forum state); <u>Klaxon Co. v. Stentor Electric Mfg. Co.</u>, 313 U.S. 487, 497 (1941) (a district court

---

[14]Plaintiff considered cross-moving for summary judgment as to the issue of liability given that, as set forth by the authority cited herein, he remained an officer and director absent board action and shareholder voting, as a matter of law. Plaintiff chose not to do so because of the other continuing claims in the case, including with respect to breach of the implied covenant, and because Plaintiff has been allowed no discovery with respect to the December 8, 2005 board resolutions.

-17-

{00206438; 7; 1103-2}

sitting in diversity must apply the conflict of laws rules of the forum state). By statute, Connecticut recognizes what is commonly referred to as the "internal affairs doctrine." CONN. GEN. STAT. § 33-224(c). According to the doctrine, the law of the state of incorporation governs and determines all issues relating to a corporation's internal affairs, including those matters that pertain to the relationships among or between the corporation and its officers, directors and shareholders. See CTS Corp. v. Dynamics Corp. of Am., 481 U.S. 69, 89-93 (1987); see also Edgar v. MITE Corp., 457 U.S. 624 (under the Commerce Clause, a state "has no interest in regulating the internal affairs of foreign corporations"); Nattel, LLC v. SAC Capital Advisors, No. 3:04CV1061, 2005 WL 2253756, at *8-9 (D. Conn. Sept. 16, 2005) (invoking internal affairs doctrine to apply Bahamian law, the state of incorporation, to issues of corporate governance). Constitutional principles mandate application of the doctrine except in the "rarest situations," such as when the law of the state of incorporation is inconsistent with a national policy on foreign or interstate commerce. CTS Corp., 481 U.S. at 89-93. No such exception here exists, so the substantive law of Delaware applies.[15]

> **B.  Defendants Failure To Secure Plaintiff's Resignation, Failure To Comply With The Bylaws And Failure To Comply With The Bylaws Renders Any Attempt To Remove Plaintiff As An Officer And Director Null, Void And Without Effect**

At no time prior to May 29, 2002 — or anytime thereafter, until, purportedly, December 8, 2005 — was there a meeting of the board of directors of Thames Holdings or a unanimous written consent resolution adopted by that board authorizing a notice of termination be given to Chardavoyne pursuant to the Employment Agreement. Huckin and McGivern admitted that there was no request

---

[15] As to all other issues in the case, whether based on contract, tort or statute, the substantive law of Connecticut applies. See infra at 28-30. Defendants' request that the Court apply the substantive law of the State of Pennsylvania, see Defendants' Memo. at 5, 15, et seq., while misguided, is of no consequence as to issues related to corporate governance, since Pennsylvania respects, as it is constitutionally required to do, the "internal affairs doctrine." See J.L. Wolgin v. State Mutual Investors, 402 A.2d 669, 672, 265 Pa. Super. 525 (1979) ("Pennsylvania courts will not take jurisdiction for purposes of regulating or interfering with internal management of a foreign corporation"). Accordingly, there can be no dispute that Delaware law applies to the requirements of the bylaws of Thames Holdings and Thames North America.

prior to the May 29, 2002 meeting that the boards of Thames Holdings and Thames North America authorize termination, or that they were aware of any board action thereafter.[16] Huckin testified that he "assumed" he had broad authority to act on behalf of Thames Plc, but that he had no written authority.[17] McGivern admitted that he had little grasp of what corporate authority he did have, and he could not identify the Thames entities he served as a director or officer.[18] Trained as a British solicitor, McGivern had acted in the capacity as legal counsel to Thames Plc in the United Kingdom.[19] His proposed ignorance of the bylaws and his own corporate authority are a glaring admission that he had no authority.

"The bylaws may contain any provision, not inconsistent with law or with the certificate of incorporation, relating to the business of the corporation, the conduct of its affairs, and its rights or powers or the rights or powers of its stockholders, directors, officers or employees." DEL. CODE ANN. tit. 8, § 109 (2006). The bylaws of a corporation are "the self-imposed rules and regulations

---

[16]Huckin and McGivern have both testified that neither requested that the respective boards of directors of Thames Holdings or Thames North America terminate Chardavoyne, nor have they ever seen board action to that effect. See infra n.6, App., Ex. 8, Huckin Dep. Tr. at 110:18-112:3; App., Ex. 7, McGivern Dep. Tr. at 102:6-103:22.

[17]See App., Ex. 8, Huckin Dep. Tr. at 99:21-101:18:
    Q.    [D]id you have any authority to bind -- sign a binding contract on behalf of . . . RWE AG?
    A.    Yes, I believe I did.
    Q.    Was that authority in writing?
    A.    No.
    Q.    Who gave you that authority?
    A.    It's authority assumed under the role that I have.
    Q.    You assumed it?
    A.    Yes. . . .
    Q.    Do you have . . . written authority to enter into a binding Agreement on behalf of Thames Water, PLC?
    A.    Written authority, no.

[18]See App., Ex. 7, McGivern Dep. Tr. at 17:22-19:21:
    A.    There are so many companies that I'm an officer of that we could probably spend a whole day going through it . . . . Th[is] [is] speculation only because I'm a director and officer of so many different companies within the [Thames Water] group that it's difficult for me . . . to say exactly which companies I'm a director of because there is -- it is numerous.

In fact, McGivern claimed that in May 2002, he was an officer of Thames Holdings, although there is no evidence that he was actually an officer of Thames Holdings, nor could he recall what office he held. McGivern Dep. Tr. at 18:5-11.

[19]See App., Ex. 7, McGivern Dep. Tr. at 9:6-10:15.

-19-

{00206438; 7; 1103-2}

deemed expedient for . . . the . . . convenient functioning" of the corporation. Gow v. Consolidated Coppermines Corp., 165 A. 136, 140, 19 Del. Ch. 172, 180-181 (Del. Ch. 1933). Delaware corporation law "is framed in harmony with this conception of the purpose which the bylaws are designed to serve." Id. The charter of a corporation and its bylaws, moreover, "are the fundamental documents governing the conduct of corporate affairs." Burr v. Burr Corp., 291 A.2d 409, 497 (Del. Ch. 1972). "These documents establish norms of procedure for exercising rights and all stockholders have a right to rely on them as to notice and *other procedural requirements stated therein*." Id. (emphasis added). "Fairness and good order require that charter and bylaw requirements be followed in selecting directors, officers and otherwise giving life to the corporate body." Id.[20]

Defendants' bylaws set forth the required procedures for removal, termination and succession of corporate officers and directors.[21] In admittedly failing to take any action or follow any of the procedures required by their corporate bylaws prior to Chardavoyne's resignation in December 2004, McGivern and Huckin could not remove or otherwise terminate Chardavoyne as president and director of either corporate defendant.

    C.    **Defendants' Attempt In December 2005 To Ratify The Prior Acts Of Unauthorized Persons Is Ineffective**

Defendants' purported ratification through board resolution and shareholder vote in December 2005 has absolutely no legal effect with respect to the period of May 29, 2002 through December 10, 2004 when Plaintiff resigned. The unauthorized acts of unauthorized persons cannot be ratified after-the-fact when, in the interim, subsequent events (e.g., Chardavoyne's resignation in December 2004) render the initial action moot.

---

[20] Delaware General Corporation Law states that "[o]fficers shall be chosen in such manner and shall hold their offices for such terms as are prescribed *by the bylaws*." DEL. CODE ANN. tit. 8, § 142 (2006) (emphasis added). As for directors, the "bylaws may prescribe other qualifications for directors," and the "numbers of directors shall be fixed by, *or in the manner provided in*, the bylaws . . . ." DEL. CODE ANN. tit. 8, § 141 (2006) (emphasis added).
[21] App., Ex. 6, Bylaws, Thames Water North America, Inc. ("Bylaws Thames North America"); App., Ex. 5, Bylaws, Thames Water Holdings Incorporated ("Bylaws Thames Holdings").