"To constitute ratification, the affirmance of a transaction must occur *before* the other party [Chardavoyne] manifested his withdrawal from it either to the purported principal or to the agent, and before the offer or agreement has otherwise terminated or been discharged." RESTATEMENT (SECOND) AGENCY § 88 (emphasis added). In Cook v. Tullis, 85 U.S. 332 (1873), the Supreme Court noted that "if an individual pretending to be an agent of another should enter into a contract for the sale of land of his assumed principal, it would be impossible for the latter to ratify the contract if, between its date and the attempted ratification, he had himself disposed of the property. He could not defeat the intermediate sale made by himself, and impart validity to the sale made by the pretended agent, for his power over the property or to contract for its sale would be gone." Id. at 338-339.

Equity also weighs heavily to prevent Defendants from prejudicing Plaintiff's rights after the fact. In Pape v. Homes Ins. Co., the Second Circuit articulated the "well settled rule" that "ratification does not date back to destroy intervening rights of third persons *or otherwise to achieve an inequitable result.*" 139 F.2d 231, 235 (2d Cir. 1943) (emphasis added); see also Guaranty Bank and Trust Co. v. Reyna, 201 N.E.2d 144, 51 Ill. App. 2d 412 (1964) (a purported principal was estopped from later asserting its purported agent had authority after it erroneously informed the promisee that its purported agent did not have authority and waited 2 months to correct their error, meanwhile the promisee repudiated the lease). "If the affirmance of a transaction occurs at a time when the situation has so materially changed that it would be inequitable to subject the other party to liability thereon, the other party has an election to avoid liability." RESTATEMENT (SECOND) AGENCY § 89; see RESTATEMENT (THIRD) AGENCY § 4.05 (Tentative Draft No. 2, 2001) ("[a] ratification of a transaction is not effective unless it precedes the occurrence of circumstances that would cause the ratification to have adverse and inequitable effects on the rights of third parties. These circumstances include: (1) any manifestation of intention to withdraw from the transaction made by the third party;

-21-

{00206438; 7; 1103-2}

(2) any material change in circumstances that would make it inequitable to bind the third party, unless the third party chooses to be bound; and (3) a specific time that determines whether a third party is deprived of a right or subjected to a liability").

The above makes clear that Defendants' attempt at ratification, performed on the eve of and in conjunction with moving for summary judgment, can have no effect.

## II. NEITHER HUCKIN NOR MCGIVERN HAD ANY AUTHORITY UNDER THE EMPLOYMENT AGREEMENT TO TERMINATE OR REMOVE PLAINTIFF

Defendants failed to follow the express, black letter terms of the Employment Agreement regarding termination prior to Chardavoyne's resignation on December 10, 2004. By the July 12 Hawkins Letter, Chardavoyne catalogued the list of reasons why no notice of termination could possibly have issued on May 29, 2002 or thereafter. Defendants choose to take no action, opting not even to respond to the July 12 Hawkins Letter. What remains is a record documenting Defendants' bad faith breach of the Employment Agreement, failing, among other things, to pay wages and other benefits due and owing to Plaintiff after June 6, 2003.

### A. Defendants Admit Non-Compliance With The Express, Black Letter Requirements Of The Employment Agreement Pertaining To Termination

Huckin testified that he "assumed" he had broad authority to act on behalf of Thames Water Plc, but that he had no written authority.[22] McGivern conceded that he had little grasp of what corporate authority he did have, and he could not parse the alphabet soup of entities he served as a director and officer during his deposition.[23]

The deposition testimony of Alexander, the Chief Executive of Thames Plc, shows that he did not authorize Chardavoyne's termination before May 29, 2002. Alexander testified that he had

---

[22] See note 16, supra (App., Ex. 8, Huckin Dep. Tr. at 99:21-101:18)
[23] See note 17, supra (App., Ex. 7, McGivern Dep. Tr. at 17:22-19:21)

very little involvement in, understanding of or control over Huckin's and McGivern's attempt to remove Chardavoyne:[24]

    (a)    Alexander admitted that the never authorized the termination of Chardavoyne, his senior executive in the United States, in writing;[25]

    (b)    Alexander was not aware the positions of President of Thames Holdings and Thames North America were being eliminated;[26]

    (c)    Alexander did not review Huckin's May 29 Letter or Draft Separation Agreement;[27]

    (d)    Alexander did not review the bylaws of Thames Holdings or Thames North America;[28]

    (e)    Alexander did not know if or when Chardavoyne was terminated;[29] and

    (f)    Alexander did not believe that Chardavoyne breached the Employment Agreement.[30]

---

[24] Alexander remained uninformed regarding Chardavoyne's status. See discussion, supra at 13, concerning the correspondence involving Chardavoyne, Alexander and Boylin between December 2002 and January 2003, even after the litigation began; note 11, supra (App., Ex. 21, Alexander Dep. Tr. at 34:5-18)

[25] See note 10, supra (App., Ex. 21, Alexander Dep. Tr. at 16:10-12)

[26] See id. at 26:7-13:
    Q.    [Prior to May 29, 2002] [h]ad you concluded that the role of president of Thames Water Holdings Incorporated and Thames Water North America . . . was no longer required as of that date?
    A.    I was not aware of that, but that would be Jim McGivern's responsibility.

[27] See id. at 21:11-14:
    Q.    [P]rior to May 29, 2002], did you see the proposed letter that Mr. Huckin was going to . . . deliver to Mr. Chardavoyne or the draft separation agreement?
    A.    I have no recollection of seeing it.

[28] See id. at 16:13-18:
    Q.    Have you ever seen the bylaws of Thames Water Holdings I-N-C-.?
    A.    I have not.
    Q.    Have you ever seen the bylaws of Thames Water North America?
    A.    I have not.

[29] See id. at 36:22-37:3:
    Q.    [A]s the chief executive, is [it] the company's position that Mr. Chardavoyne was terminated in May of 2002 or May of 2003?
    A.    I do not have that detail.

See id. at 39:11-20.
    Q.    Mr. McGivern . . . testified that [Chardavoyne was terminated on May 29, 2002]. . . . [I]f he testified to that, you would agree with it?
    A.    *I don't always agree with what my executives say.* (emphasis added).

[30] See id. at 42:8-11.
    Q.    Is it your contention that Mr. Chardavoyne . . . breached his employment agreement in any way?
    A.    No.

{00206438; 7; 1103-2}

Huckin claimed to have discussed Chardavoyne's employment with Alexander prior to the May 29, 2002 meeting, but admitted that he did not discuss Chardavoyne's termination.[31] Similarly, McGivern claimed to have kept Alexander "broadly" informed about his effort to remove Chardavoyne App., Ex. 7, McGivern Dep. Tr. at 64:2-21, but Alexander had no recollection of any such discussions with McGivern:

> Q. Other than Mr. Huckin, did you discuss the substance of the terms of the purported termination of Mr. Chardavoyne with anyone else . . .
>
> A. The short answer is no.

App., Ex. 21. Alexander Dep. Tr. at 24:13-23. Accordingly, not only did Huckin and McGivern admittedly not have any corporate authority, neither did they have authority to act on behalf of the Chief Executive of Thames Plc.

### B. There Was No Substantial Performance With The Employment Agreement

Defendants' invocation of the doctrine of "substantial performance" to justify an enforceable notice of termination fails as a matter of law. See Memorandum of Law in Support of the Defendants' Motion for Summary Judgment ("Defendants' Memo.") at 20 n.3. To be sufficient, notice to terminate must first be authorized. Because Defendants never authorized termination as a matter of corporate governance and the Chief Executive of Defendants' parent company never authorized termination, Defendants' "substantial performance" argument collapses.

Defendants' reliance on the doctrine of substantial performance separately fails because such issue cannot be resolved on a motion for summary judgment:

---

[31] See App., Ex. 8, Huckin Dep. Tr. at 65:4-19:
   Q.   [D]id you have any conversation with Alexander [prior to May 29, 2002] about presenting a draft Separation Agreement to Mr. Chardavoyne?
   A.   No.
   Q.   Did you have any discussion with Mr. Alexander at that time about terminating or attempting to terminate Mr. Chardavoyne?
   A.   Not in those terms, no.

-24-

> [I]t is not appropriate, on a motion for summary judgment, for the court to determine the parties' dispute as to whether [a party] substantially performed its obligations under the contract. Rather, when contested, the question whether a party substantially performed under a contract is a genuine issue of material fact that must be resolved by a jury.

Woodman Design Group, Inc. v. Homesteads of Newtown, LLC, No. Civ. A. 301CV2029SRU, 2003 WL 22272596, at * 3 (D. Conn. Sept. 30, 2003); see also Alliance Group. Servs., Inc. v. Grassi & Co., 406 F.Supp.2d 157, 164 (D. Conn. 2005) (denying summary judgment because genuine issue of fact remained as to the Defendant's performance and breach under a contract); Grant & Simmons v. Coopers & Lybrand, No. CV91 286079S, 1992 WL 184306, at * 3 (Conn. Super. Ct. Jul. 23, 1992) ("it is well settled that issues of repudiation and revision of a contract are normally questions of fact to be determined at trial").

This is equally true within the employment context involving purported notice of termination. Monning, 603 F. Supp. at 1038 (court denied summary judgment, finding that defendants did not show "conclusively" that the letter constituted "notice of termination."); Malis, Inc. v. Comm. Union Ins. Co., No. CV980330811S, 2001 WL 1682753, at *2 (Conn. Super. Ct. Dec. 12, 2001) (whether a "termination" was a "breach of contract" was a "question of fact).[32]

## III. BECAUSE DEFENDANTS NEVER ACTED WITH AUTHORITY TO TERMINATE, PLAINTIFF IS ENTITLED TO PROCEED WITH EACH CLAIM OF THE COMPLAINT

Huckin and McGivern acted without authority. Alexander as Chief Executive of Thames Plc never granted authority. Thames Holdings never issued notice of termination. As a matter of corporate governance, neither Thames Holdings nor Thames North America took action to remove,

---

[32] Delaware law, controlling on matters of Defendants' corporate governance, is in accord. See CYCH Inc. v. EVS Holding Co., 292 B.R. 32, 35 (Bankr. D. Del. 2003) (denying summary judgment because of genuine issue of fact as to alleged notice of termination); Relational Funding Corp. v. TCIM Servs., Inc., No. Civ. A. 01-821-SLR, 2003 WL 21146746, at *1 (D. Del. May 13, 2003) (denying summary judgment because "genuine issue of material fact exists as to whether notice of termination was properly sent").

elect a successor or terminate Chardavoyne as an officer or director. Accordingly, Plaintiff is entitled to pursue his claim for damages under each count of the amended complaint.

### A. Plaintiff Is Entitled To Pursue His Claim For Breach Of The Employment Agreement As Against Both Thames Holdings And Thames North America

In order to establish a claim for breach of contract, Plaintiff must demonstrate (1) the formation of an agreement, (2) performance by one party, (3) breach of the agreement by the other party, and (4) damages. Rosato v. Mascardo, 82 Conn. App. 396, 411 (2004); see also Chem-Tek, Inc. v. General Motors Corp., 816 F. Supp. 123, 131 (D. Conn. 1993); O'Hara v. State, 218 Conn. 628 (1991).

Connecticut's choice of law provisions, applicable in this forum, call for the application of Connecticut law to Chardavoyne's claim for breach of contract. While Pennsylvania law, referenced at section 24 of the Employment Agreement, recognizes the same elements to a claim for breach of contract,[33] Defendants wrongly invite this Court to apply the substantive law of a foreign state with absolutely no nexus to the contract or transactions at issue in this case. Defendants' unsupportable purpose is to attempt to limit damages, contrary to Connecticut public policy intended to protect Connecticut residents like Chardavoyne. The Connecticut Supreme Court set forth the standard which overrides the contractual choice of law provision relied upon by Defendants:

> We conclude, in accordance with § 187 of the Restatement, that parties to a contract generally are allowed to select the law that will govern their contract, unless either: '(a) the chosen state has no substantial relationship to the parties or the transaction and there is no other reasonable basis for the parties' choice, or (b) application of the law of the chosen state would be contrary to a fundamental policy of a state which has a materially greater interest than the chosen state in the determination of the particular issue and which . . . would be the state of the applicable law in the absence of an effective choice of law

---

[33] See Corestates Bank, N.A. v. Cutillo, 723 A.2d 1053, 1058 (Pa. Sup. Ct. 1999) ("a cause of action for beach of contract must be established by pleading (1) the existence of a contract, including its essential terms, (2) a breach of a duty imposed by the contract and (3) resultant damages."); General State Auth. V. Coleman Cable & Wire Co., 27 Pa. Cmwlth. 385, 365 A.2d 1347, 1349 (1976).

-26-

by the parties.

Elgar v. Elgar, 238 Conn. 839, 850 (1996) (citing RESTATEMENT (SECOND) OF CONFLICT OF LAWS § 187 (1971)). "As the Connecticut Supreme Court has formulated the rule, a finding that subsection (a) *or* subsection (b) of § 187 [of the Restatement] applies would make the contractual choice of law provision unenforceable." United Rentals, Inc. v. Pruett, 296 F. Supp.2d 220, 231 n.5 (D. Conn. 2003).

Pennsylvania has no meaningful relationship to this case. Thames North America was, at all relevant times, a Delaware Corporation authorized to do business in Connecticut with its principal place of business in Stamford, Connecticut. Defendants admit that Thames Holdings was a Delaware corporation with an office in Stamford, Connecticut where Chardavoyne was employed. The Employment Agreement defines Chardavoyne's place of work to be Stamford, Connecticut. The Draft Separation Agreement given to Chardavoyne on May 29, 2002 recites that the offices of Thames Holdings are at 281 Tresser Boulevard, Stamford Connecticut. In connection with Defendants' motion to dismiss for lack of personal jurisdiction and improper venue (denied by order of the Court (Eginton, J.) dated October 26, 2004, App., Ex. 40), Chardavoyne submitted an affidavit detailing the contacts and nexus with Connecticut, all of which are overwhelming.[34] Perhaps most telling, and conclusive to the issue, Defendants deny Pennsylvania as their principal place of business. See App., Ex. 27, Defendants' Answer, Affirmative Defenses and Counterclaims to the Plaintiff's Second Amended Complaint, dated April 14, 2005 at ¶ 3.

Separate from the issue of contacts, Defendants suggest that the substantive law of Pennsylvania is less favorable to Chardavoyne. Connecticut law concerning the enforcement of

---

[34] See App., Ex. 28, Affidavit of David E. Chardavoyne ("Chardavoyne Aff."), dated April 21, 2003, herein adopted by reference pursuant to FED. R. CIV. P. 10(c).

employment agreements requires strict adherence to conditions precedent to termination to protect Connecticut citizens from arbitrary unauthorized conduct, which is precisely at issue in this case. Defendants need look only to B. Finder Assocs. v. Coldform, Inc., No. CV03052375S, 2005 WL 1331811 (Conn. Super. Ct. May 5, 2005), a case they cite, to see how seriously Connecticut regards conditions prior to termination:

> Terms of a contract allowing termination under certain conditions are generally strictly construed. 'If a party who has a power of termination by notice fails to give the notice in the form and at the time required by the agreement, it is ineffective as a termination.' 13 A. Corbin, Contracts (Rev. Ed. 2003) § 68.9(3), pp. 258-59. 'As with any other express condition in a contract, the conditions of termination should be strictly construed.'

Id. at *2. Accordingly, the substantive law of Connecticut applies with respect to Chardavoyne's claim for breach of the Employment Agreement, not only by reason of a substantial relationship to this forum, but to give proper effect to Connecticut's established public policy.

Contrary to Defendants' assertion, The Employment Agreement provides ample evidence of a contract relationship between Plaintiff and Thames North America, in addition to the express agreement between Plaintiff and Thames Holdings. As set forth in the Employment Agreement:

(a) The "Parent Company" means Thames Water Plc;

(b) "The Group" means the Parent Company, *all Subsidiaries of the Company*, and all other companies whose equity share capital is owned as to 20 per cent or more by the Parent Company or any of its subsidiaries (emphasis added);

(c) "Group Company" means any company within The Group;

App., Ex. 2, Employment Agreement at § 1.1. The Employment Agreement expands Plaintiff's duties beyond that of solely serving Thames Holding or Thames Water Plc. Specifically, the Employment Agreement provides the following material facts evidencing Plaintiff's duties to "The Group" and thereby establishes sufficient evidence that could reasonably support a jury's verdict for the Plaintiff:

-28-

{00206438; 7; 1103-2}

(a) Plaintiff is obligated to serve any "other appointment" with all attendant responsibilities, duties and authority "as the Chief Executive may from time to time direct." Id. at § 2.1;

(b) Plaintiff is mandated to "undertake[] well and faithfully to serve . . . *the Group* and use his best endeavours to promote, develop and extend the business and interests of . . . *the Group*." Id. at § 2.3 (emphasis added);

(c) Plaintiff is mandated to, "(without further remuneration) if and for so long as the Chief Executive requires, carry out duties *on behalf of any other Group Company . . .* ." Id. at § 2.5 (emphasis added);

(d) Thames Holdings agreed to provide Plaintiff with a company car "for his use in the business of any *Group Company* . . . ." Id. at § 7 (emphasis added);

(e) Thames Water Plc has summary termination power if Plaintiff commits any "serious, willful or persistent breach of any of *his obligations to . . . any Group Company* . . . ." Id. at § 12.2(b) (emphasis added); and

(f) Thames Holding granted Plaintiff the right to possess and control certain personal property of any other "*Group Company*." Id. at § 13.2 (emphasis added).

Plaintiff had attendant responsibilities, duties and authority to any Group Company to which he was assigned. Such responsibilities, duties and authority expressly extended to Thames North America.

Additionally, Thames North America accepted the benefits of the contract and cannot now deny the fruits it has received.[35] When a corporation, with knowledge of the facts, "accepts or retains the benefits of an unauthorized contract or other transaction by its officers or agents, as where it accepts the benefit of services, etc.," it thereby ratifies the contract or other transaction, or will be estopped to deny ratification. Cohen v. Holloways, Inc., 158 Conn. 395, 409 (1969). Plaintiff has established sufficient facts to demonstrate an agreement between Plaintiff and Thames North America, thereby allowing Plaintiff to pursue claims for breach of contract directly against Thames North America.

---

[35]"The unauthorized employment of third persons to perform services on behalf of a principal may be impliedly ratified by the principal." 2A C.J.S. Agency § 76 (2003).

-29-

{00206438; 7; 1103-2}

### B. Plaintiff Is Entitled To Pursue His Claim For Breach Of The Implied Covenant Of Good Faith And Fair Dealing

In a desperate attempt to evade the consequences of their own bad acts, Defendants invoke the Employment Agreement's choice of Pennsylvania law to construe the contract in order to avoid Plaintiff's tort claim of breach of the implied covenant. As a Connecticut resident, Plaintiff is entitled to the protection and application of Connecticut law, most assuredly for claims sounding in tort. Connecticut law recognizes a cause of action for breach of the implied covenant sounding in tort independent of a cause of action on the contract itself, directing further that disposition of a claim for breach of the implied covenant on summary judgment is improper.

Choice of law provisions in a contract, even if enforceable, do not preclude the application of another state's law to a claim sounding in tort:

> Connecticut's courts have held that 'narrowly drawn choice of law provisions do not preclude causes of action under the laws of another state where such causes of action are not based in contract.' A tort claim, even one that is closely related to the subject matter of the contract, may be brought even where it would be barred under the law of the state . . . under the contractual choice of law agreement.

Benefit Concepts New York, Inc. v. New England Life Ins. Co., No. 3:03CV1456, 2004 WL 1737452, at *3 (D. Conn. July 30, 2004). This Court further explained that choice of law provisions like the one in the Employment Agreement are too narrow to cover tort claims:

> [C]ontracts that are 'governed by and construed in accordance with' the laws of a state . . . fall[] squarely in the category of provisions that are too narrow to permit a reading that encompasses tort, rather than contract, claims.

Id. The Benefits Concept Court declined to enforce the choice of law provision and applied the law of the state with the "most significant relationship," which is the prevailing test in Connecticut. Id. at 4; accord U.S. Fidelity and Guar. Co. v. S.B. Phillips Co., 359 F. Supp. 2d 189, 206 (D. Conn. 2005) (finding that clauses which say "governed by and construed in accordance" with the law of a particular state "have repeatedly been deemed too narrow to encompass tort claims arising out of

-30-

{00206438; 7; 1103-2}