contract-related transactions."). Pennsylvania federal courts agree. See De Lage Landen, 2001 WL 799870, at *2.

Section 24 of the Employment Agreement employs this very same language as in S. B. Phillips Co., and therefore cannot govern to foist application of Pennsylvania law to Chardavoyne's tort claim of breach of the implied covenant. Instead, the court must look to Connecticut's "most significant relationship test," which is applied through a four-pronged analysis of "(a) the place of injury; (b) the place where the conduct causing the injury occurred; (c) the domicile, residence, nationality, place of incorporation and place of business of the parties; and (d) the place where the relationship . . . between the parties is centered." Benefit Concepts, 2004 WL 1737452, at *4. Based on the extensive analysis set forth above, the answer is overwhelming that Connecticut has the most significant relationship.

Chardavoyne has a very specific and growing list of grievances that evidence Defendants' bad faith. In Connecticut, it is well settled that every contract carries an implied covenant of good faith and fair dealing that requires neither party will do anything to injure the rights of another under that agreement. Habetz v. Condon, 224 Conn. 231, 238 (1992).[36] The Plaintiff asserting such breach must plead: (1) there was a contract under which the Plaintiff reasonably expected to receive certain benefits; (2) the Defendants engaged in conduct that injured the Plaintiff's rights to receive some or all of those benefits; and (3) when engaged in such conduct, the Defendants were acting in bad faith. Id. The Connecticut Supreme Court, moreover, has specifically recognized claims for a breach of the implied covenant of good faith and fair dealing in employment contracts. See Magnan v. Anaconda

---

[36]Defendants cite no support for their baseless suggestion that Chardavoyne must allege a specific implied term of the contract beyond the implied covenant that the parties will not injure the rights of one another. See Defendants' Memo. at 29.

Indus., Inc., 193 Conn. 558 (1984) ("endors[ing] the applicability of the good faith and fair dealing principle to employment contracts").[37]

*REFUSING TO PAY STOCK.* As noted above, Chardavoyne was awarded 872 shares under Defendants' LTIP program. In an October 5, 2002 letter, Huckin promised to pay these shares. App., Ex. 13. Levine also confirmed Huckin's offer to deliver the 872 shares in his letter of November 8, 2002. App., Ex. 14 at 3. Huckin admitted in his deposition testimony that Levine's letter evidences an understanding that Defendants would pay the 872 shares.[38] Vested stock options constitute an enforceable property right. Bender v. Bender, 258 Conn. 733, 768-69 (2001). The right to collect on stock options accrues upon vesting. Bornemann v. Bornemann, 245 Conn. 508, 517 (1998). Action taken by an issuing employer to foreclose vesting does not prevent the employee from collecting the stock grant or its value. Butler v. Cadbury Beverages, Inc., 3:97-CV-2241, 1999 WL 464527 (D. Conn. June 30, 1999).

*MISREPRESENTATIONS CONCERNING THE DRAFT SEPARATION AGREEMENT.* Despite the fact that the terms of the Draft Separation Agreement were demonstrably worse than the Employment Agreement, Huckin and McGivern falsely represented to Chardavoyne that the Draft Separation Agreement was a better deal. McGivern testified that he never actually made a determination as to

---

[37]With respect to Chardavoyne's bad faith claims, Defendants have admitted that Chardavoyne was not an at-will employee. Defendants Memo. at 36.

[38]See App., Ex. 8, Huckin Dep. Tr. at 155:7-15:
    Q.    Isn't [the November 8 Levine Letter] an understanding that you were going to pay out the 852 [sic] RWE shares?
    A.    Yes.
    Q.    But they haven't been paid?
    A.    No.
    Q.    And it's your intention not to pay them?
    A.    Correct.

whether the Draft Separation Agreement was better than the Employment Agreement.[39] Defendants repeated this misrepresentation through subsequent correspondence.[40]

Assuming there was an authorized termination under the Employment Agreement, Chardavoyne had a right to medical benefits under Defendants' medical plan for at least 12 months from the date of written notice of termination, followed by an option to continue medical coverage under COBRA for eighteen (18) months thereafter (i.e., a total of thirty (30) months). Employment Agreement at § 5.3. The Draft Separation Agreement, however, purported to begin COBRA coverage immediately, so that Chardavoyne's COBRA coverage would have expired eighteen (18) months from the date the Draft Separation Agreement would have become effective. Draft Separation Agreement at § 3.04.[41]

REFUSAL TO ALLOW CHARDAVOYNE TO LOOK FOR A JOB. Defendants said Chardavoyne was prohibited from looking for another job. Richardson stated that Chardavoyne was restricted from seeking competitive employment until "May 29, 2004." App., Ex. 17 at 2. Levine claimed Chardavoyne was subject to a "bar against other employment," also stating that "Chardavoyne is not free to seek employment without Thames' consent during the notice period." App., Exs. 29 and 14. It was not until November 19, 2003, that Defendants permitted Chardavoyne to look for new job.

---

[39] See App., Ex. 7, McGivern Dep. Tr. at 63:2-7.

[40] See, e.g., App., Ex. 17, June 10 Richardson Letter ("The Company still believes that its offer presented Mr. Chardavoyne with a better alternative to the termination of his employment without cause pursuant to the [Employment] Agreement."); App., Ex. 14, November 8 Levine Letter ("Thames believed (and believes) that the draft separation agreement would have improved the respective position of both parties.")

[41] The Draft Separation Agreement was less favorable than the Employment Agreement in other respects. Under the Employment Agreement, the non-compete provisions were limited to "Group Compan[ies]," which were defined as Thames Water Plc, its subsidiaries, and any other company in which Thames Water Plc or its subsidiaries owned twenty per cent (20%) of its stock. App., Ex. 2, Employment Agreement at § 1.1. Conversely, the Draft Separation Agreement significantly expanded the scope of the non-compete to include the Group Companies *plus* Thames Water Americas *and* RWE AG, the ultimate parent company and overarching German conglomerate that owns and/or controls the Group companies, and related corporations, associations or entities (by any one or more of licensing, ownership, or control). App., Ex. 11, Draft Separation Agreement at §§ 1.01, 3.10, et seq. The Draft Separation Agreement also extends the geographic scope throughout the United States and Puerto Rico, which is not a part of the Employment Agreement. Id. at § 3.10. The Draft Separation Agreement, in fact, provided that Chardavoyne was not free to take another job or to *associate* with any person or entity competitive with this expanded universe of companies without their "express written consent." Id. at § 3.10.

App., Ex. 30, Letter from Jonathan Orleans ("Orleans"), dated November 19, 2003. Defendants' refusal to permit Chardavoyne to seek meaningful employment is hardly consistent with an intent to terminate him.

*THREATS REGARDING MEDICAL BENEFITS.* Defendants have threatened to withhold, or to prematurely terminate, continuing medical insurance benefits to which Chardavoyne had a right by federal statute, including such rights and benefits under COBRA. On behalf of Defendants, Joanne Volk sent Chardavoyne a letter dated November 3, 2004, in which she purported to notify Chardavoyne that his COBRA benefits would be "exhausted" as of December 1, 2004. App., Ex. 1, Letter from Joanne Volk to Chardavoyne, dated November 3, 2004. As indicated previously, such position violated the eighteen month minimum guaranteed by COBRA under federal law.

*FALSE ACCUSATIONS.* Defendants have made false and unfounded accusations that Chardavoyne was "verbally abusive" toward Defendants' employees. See App., Ex. 31. When asked to provide affidavits substantiating this alleged abuse, Defendants refused. App., Ex. 32.

*UNREASONABLE DELAY IN PAYMENT OF NON-QUALIFIED DEFERRED COMPENSATION.* Chardavoyne received payment pursuant to Defendants' Non-Qualified Deferred Compensation plan on December 30, 2003 in the amount of $153,433.24. App., Ex. 33. Upon information and belief, Defendants paid other recipients under this plan well before Chardavoyne, delaying his payment unreasonably and without reason. See Chardavoyne Aff. at ¶ 17.

*FAILURE TO PROVIDE ACCURATE W-2 REPORT.* In or about March 2004, Chardavoyne requested that Defendants furnish a revised W-2 form because it incorrectly underreported income. App., Ex. 34. Despite repeated requests, Defendants never provided Chardavoyne with an accurate federal income tax W-2 form for 2003 and refused to communicate directly with Chardavoyne to resolve the discrepancies. Id.; see Chardavoyne Aff. at ¶ 18.

*PREJUDICING CHARDAVOYNE'S NEW JOB.* Chardavoyne secured new employment as President and Chief Executive Officer of the San Antonio Water System ("SAWS"), which was announced publicly on November 21, 2004. In an effort to harm Chardavoyne and prejudice his new job, Defendants made a baseless counterclaims for conversion and statutory theft—including "embezzlement" of the company car—long after Chardavoyne had already resigned his position with Thames Holdings and returned his company car to Defendants on December 14, 2004. App., Ex. 27, Defendants' Answer at 14-15. Defendants admitted that they never reported the car stolen to the police, never made an insurance claim for a stolen car, and never took any affirmative steps to retrieve the car.[42] See Chardavoyne Aff. at ¶ 19.

After he resigned, Defendants threatened to take the deposition of Chardavoyne's new superiors. This threat to drag Chardavoyne's new employer into this case—who had no relationship whatsoever with the matters at issue—was allegedly for the purpose of "discover[ing] statements and representations Mr. Chardavoyne has made to third parties concerning his employment with Thames Water and the termination of that employment, and we intend to take appropriate steps to discover that information." App., Ex. 32.

Additionally, Defendants made negative statements and misrepresentations about Chardavoyne to employees of Chardavoyne's new employer, San Antonio Water System. William

---

[42] See App., Ex. 8, Huckin Dep. Tr. at 142:5 - 144:2:
    Q.    Between May 29, 2003 and December 2004, did you ever report the car stolen to the police?
    A.    No.
    Q.    Did you ever report the car stolen to the insurance company?
    A.    No. . . .
    Q.    Did you ever send anybody to -- to take back your car?
    A.    No.
    Q.    Did you report it stolen to the company you leased it from?
    A.    No.
    Q.    If your car was missing in the morning, what would you do?
    A.    If my car was missing? I would report it to the police. Our car wasn't missing. We knew where it was.

Malarkey ("Malarkey") was the President of Thames North America, and a employee of American Water, a subsidiary of Thames Water Plc. See App., Ex. 36. On June 2, 2005, Malarkey sent an email to a Thomas Smith (at tsmith@saws.org) and Steve Kosub (at skosub@saws.org). Id. In this email, Malarkey disparaged Chardavoyne, misrepresenting and casting Chardavoyne's relationship with Defendants and other former employers in a poor manner. Id.

Allegations concerning breach of the implied covenant of good faith and fair dealing are questions of fact inappropriate for disposition by summary judgment. Stewart v. Cendant Mobility Servs., No. CV000337994S, 2002 WL 442385, at * 4 (Conn. Super. Ct. Feb. 21, 2002). In Stewart, the Plaintiff sued on her alleged employment contract as a senior executive. The court held a "genuine issues of material fact exist" as to whether the Defendants breached the implied covenant of good faith and fair dealing. For the very same reasons, Defendants' motion seeking summary disposition as to Plaintiff's claim for breach of the implied covenant ought to be denied.

### C. Plaintiff Is Entitled To Pursue His Claim For Wages And Benefits

Section 31-72 of the Connecticut General Statutes provides Plaintiff, at all relevant times working and residing in Connecticut, a private cause of action with respect to wages owed in accordance with CONN. GEN. STAT. §§ 31-71a to 31-71i, inclusive, as well as a private cause of action as to benefits owed in accordance with CONN. GEN. STAT. § 31-76k.

#### 1. Plaintiff Has An Enforceable Wage Claim

Section 31-72 expressly permits an employee to commence a civil action to recover twice the full amount of wages that an employer fails to pay. See CONN. GEN. STAT. § 31-72. Employers may also be required to pay costs, including reasonable attorney's fees. Id.

Under the statute, an employer "includes any individual, partnership, association, joint stock company, trust, corporation, the administrator or executor of the estate of an incompetent, or the receiver, trustee, successor or assignee of any of the same, employing any person. . . . " CONN. GEN.

-36-

STAT. § 31-71a(1). An employee "includes any person suffered or permitted to work by an employer." CONN. GEN. STAT. § 31-71a(2). "The purpose of § 31-72 is remedial, and therefore it must be given a liberal construction in favor of those whom the legislature intended to benefit." Tianti v. William Raveis Real Estate, Inc., 231 Conn. 690, 696 (1995); see Chrysler Corp. v. Maiocco, 209 Conn. 579, 595 (1989).

### 2. **Plaintiff Has An Enforceable Benefits Claim**

For the same reasons and with equal force, Plaintiff is entitled to pursue his claims for benefits under CONN. GEN. STAT. § 31-72 and in accordance with CONN. GEN. STAT. § 31-76k. A violation of § 31-76k may also constitute a violation of § 31-72. Woolley v. Bank of Boston Connecticut, No. 115069, 1994 WL 380421, at *2 (Conn. Super. Ct. July 13, 1994). The purpose of § 31-76 being to require employers to compensate terminated employees for the "kind of accumulated compensation for past services and a material recognition of their past value" wrongfully withheld upon termination. Id.

Defendants' challenge that Plaintiff's claims for medical and retirement benefits are preempted by federal law is without support. See Defendants' Memo. at 34. Defendants have not plead preemption under the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. § 1002(3), or otherwise. App., Ex. 27. An employer's decision to extend benefits does not constitute, in and of itself, the establishment of an ERISA plan. Fort Halifax Packing Co. v. Coyne, 482 U.S. 1 (1987). Defendants set forth no facts or analysis to demonstrate that the Employment Agreement constitutes an "employee benefit plan" regulated by ERISA with respect to Plaintiff's alleged claims for benefits. See 29 U.S.C. § 1144.

Even if ERISA were to apply, it is of no consequence since (i) Plaintiff's pleading provides sufficient notice of the claim; and (ii) this Court has jurisdiction to require Defendants to defend

under ERISA in any event. In <u>Devine v. Combustion Engineering, Inc.</u>, this Court held that ERISA preempted plaintiff's state law claims, but under the applicable "liberal" notice pleading standards, plaintiff's state law-based count put defendants sufficiently on notice that they would have to defend a claim under ERISA. 760 F. Supp. 989, 993 (D. Conn. 1991). <u>See also</u> <u>Russo v. City of Hartford</u>, No. 3-97-CV-2380, 2006 WL 516747, at * 10 (D. Conn. Mar. 2, 2006) (finding that Defendants had notice of retaliation claim, even though it was pled as an invasion of privacy claim).

**D.    Plaintiff Is Entitled To Pursue His Claim For Conversion With Respect To Defendants' Unwarranted Withholding Of Stock**

Chardavoyne's claim regarding the 872 shares of stock is properly asserted against Thames Holdings and Thames North America. As discussed above, Plaintiff has demonstrated that Defendants' bad faith conduct and breach of the implied covenant of good faith and fair dealing frustrated or abrogated the benefits under the Thames Plc's Long Term Incentive Plan. Separate from Plaintiff's claim for bad faith breach of the implied covenant, the Employment Agreement itself specifically provides "The Executive will also be eligible for bonus payments and conditional rights to shares under any incentive scheme approved from time to time for this purpose by the *Board*." "Board" is defined as the board of directors of the Parent Company, which is defined in the Employment Agreement as Thames Plc. App., Ex. 2, Employment Agreement at §§ 5.2. and 1.1, respectively. The award of the 872 shares was, therefore, pursuant to the Employment Agreement. Plaintiff's right to receive such stock arises under the Employment Agreement and Defendants' breach thereof. It cannot be disputed that the claim is viable against Thames Holdings, as signatory, and Thames North America, also bound to the Employment Agreement for reasons already set forth.

Defendants infer that the conversion count fails for lack of adding Thames Plc, an argument entirely without merit for two reasons. First, aside from a contract right, Plaintiff's entitlement to the shares by reason of conversion accrues directly against Defendants as Defendants were agents for

payment. See Pouliot v. Paul Arpin Van Lines, 303 F. Supp.2d 135, 139 (D. Conn. 2004) (a "plaintiff seeking to recover from an agent and principal may bring an action against either the agent, or the principal or both parties" (citing Alvarez v. New Haven Register, Inc., 249 Conn. 709, 716 (1999)). Second, Defendants' position fails under the Federal Rules. *Defendants never answered with respect to paragraphs 55 through 57 of Plaintiff's Second Amended Complaint pertaining to conversion.* Compare App., Ex. 37, Plaintiff's Second Amended Complaint, dated March 9, 2005 at 13 with App., Ex. 27, Defendants' Answer at 8. Not having denied said allegations, they are deemed admitted. State of Connecticut v. U.S., 1 F. Supp.2d 147, 153 (facts not denied are deemed admitted pursuant to FED. R. CIV. P. 8(d)).

Connecticut law defines the tort of conversion as "an unauthorized assumption and exercise of the right of ownership over goods belonging to another, to the exclusion of the owner's rights. It is some unauthorized act which deprives another of his property permanently or for an indefinite time; some unauthorized assumption and exercise of the powers of the owner to his harm. The essence of the wrong is that the property rights of the Plaintiff have been dealt with in a manner adverse to him, inconsistent with his right of dominion and to his harm." Aetna Life and Casualty Co. v. Union Trust Co., 230 Conn. 779, 790-91 (1994) (quoting Moore v. Waterbury Tool Co., 124 Conn. 201, 209 (1938)); see Falker v. Samperi, 190 Conn. 412, 419 (1983); VanDerlip v. VanDerlip, 149 Conn. 285, 288-89 (1962). Plaintiff's claim of conversion properly pleads all elements. In light of the disputed issues of material facts (along with Defendants' admissions as to conversion), summary judgment is properly denied.

## CONCLUSION

Plaintiff David E. Chardavoyne respectfully requests that the Court deny Defendants' motion for summary judgment in all respects, granting such other and further relief as the Court deems just and proper.

>
> PLAINTIFF
> DAVID E. CHARDAVOYNE
>
> By: _____
> Patrick J. McHugh (ct14072)
> William M. Tong (ct25304)
> Finn Dixon & Herling LLP
> One Landmark Square, Suite 1400
> Stamford, CT  06901-2689
> Telephone: (203) 325-5000
> Facsimile: (203) 348-5777
> E-mail:   pmchugh@fdh.com
>           wtong@fdh.com

## CERTIFICATION

This is to certify that a true and correct copy of the foregoing was delivered by United States Mail, first class, postage-prepaid to the following this 28th day April, 2006:

Stephen B. Fogerty, Esq.
Halloran & Sage LLP
315 Post Road West
Westport, Connecticut 06880

Ralph W. Johnson, III, Esq.
Halloran & Sage LLP
One Goodwin Square
225 Asylum Street
Hartford, Connecticut 06103

_____
William M. Tong