# AGREEMENT BETWEEN

# THAMES WATER HOLDINGS INC

# AND

# DAVID E CHARDAVOYNE

 

# TABLE OF CONTENTS

| | | Page No |
|---|---|---|
| 1 | INTERPRETATION | 1 |
| 2 | APPOINTMENT AND DUTIES | 2 |
| 3 | PLACE OF WORK | 2 |
| 4 | HOURS OF WORK | 2 |
| 5 | REMUNERATION AND BENEFITS | 2 |
| 6 | HOLIDAY | 3 |
| 7 | COMPANY CAR | 3 |
| 8 | EXPENSES | 3 |
| 9 | INCAPACITY FOR WORK AND SICK PAY | 3 |
| 10 | MEDICAL EXAMINATION AND REPORT | 4 |
| 11 | NOTICE PERIOD | 4 |
| 12 | TERMINATION OF EMPLOYMENT | 4 |
| 13 | DUTIES ON TERMINATION | 5 |
| 14 | NON-ATTENDANCE | 6 |
| 15 | DISCIPLINE AND GRIEVANCE | 6 |
| 16 | EXCLUSIVE SERVICES AND INTEREST IN SECURITIES | 6 |
| 17 | CONFIDENTIALITY | 7 |
| 18 | MISREPRESENTATION | 7 |
| 19 | RE-ORGANISATION | 7 |
| 20 | OTHER AGREEMENTS | 8 |
| 21 | NOTICES | 8 |
| 22 | RESTRICTIONS | 8 |

23          SEVERABILITY                                              9

24          LAW APPLICABLE                                            10

 

THIS AGREEMENT is made the 15th day of January 1999 between Thames Water Holdings Inc ("the Company") a Delaware corporation with a business address at 118 South Division Street, Zelienople, PA 16063-1312 USA and David E Chardavoyne (the "Executive"), an individual residing at 27 Coventry Lane, Trumbull, CT 06611, USA.

WHEREBY IT IS AGREED that the Executive shall serve the Company upon the following terms and conditions.

## 1. INTERPRETATION

1.1    In this Agreement unless the context otherwise requires the following expressions shall have the following meanings:

"Parent Company" means Thames Water Plc.

"The Group" means the Parent Company, all Subsidiaries of the Company, and all other companies whose equity share capital is owned as to 20 per cent or more cent by the Parent Company or any of its Subsidiaries

"Group Company" means any company within the Group.

"The Board" means the Board of Directors for the time being of the Parent Company.

"The Chairman" means Sir Robert Clarke or any other person or persons jointly holding such office of the Parent Company from time to time and includes any person or persons exercising substantially the functions of the Chairman of the Parent Company.

"Chief Executive" means Mr W J Alexander or any other person or persons jointly holding such office of the Parent Company from time to time and includes any person or persons exercising substantially the functions of a Chief Executive of the Parent Company.

"Company Secretary" means Mr D Badcock or any other person whom the Board may from time to time appoint to act as Company Secretary.

"Personnel Director" means Mr A Cooper or any other person whom the Parent Company may from time to time appoint to act as Personnel Director.

"Line Manager" means Mr J McGivern or any other person or persons whom the Parent Company may from time to time appoint to act as the Executive's Line Manager.

1.2    Unless the context otherwise requires words in the singular include the plural and vice versa, and a reference to a person includes a reference to a body corporate and to an unincorporated body or person and vice versa.

1




1.3    The headings in this Agreement are for convenience only and shall have no legal effect.

## 2.    APPOINTMENT AND DUTIES

2.1    The appointment shall be effective from 15 February and the Company shall employ the Executive and the Executive shall serve the Company as President, US within Thames Water Plc with all attendant responsibilities, duties and authority, or in such other appointment as the Chief Executive may from time to time direct.

2.2    The Executive warrants that by virtue of entering into this Agreement he will not be in breach of any express or implied terms of any contract with or of any other obligation to any third party binding upon him.

2.3    The Executive undertakes well and faithfully to serve the Parent Company and the Group and use his best endeavours to promote, develop and extend the business and interests of the Parent Company and the Group.

2.4    During his employment hereunder the Executive shall exercise such powers and perform such duties in relation to the business of the Parent Company as may from time to time be vested in or assigned to him by his Line Manager and shall in all respects comply with reasonable directions given by or under the authority of his Line Manager.

2.5    The Executive shall (without further remuneration) if and for so long as the Chief Executive requires, carry out duties on behalf of any other Group Company and shall carry out such duties as if they were duties to be performed by him on behalf of the Parent Company.

## 3.    PLACE OF WORK

The Executive's place of work shall be Stamford, CT or such other place in the USA as the Chief Executive may reasonably require. The Executive may be required to travel and work both inside and outside the USA in the proper performance of his duties under this Agreement.

## 4.    HOURS OF WORK

The Executive shall work such hours as are necessary for the proper performance of his duties hereunder. During that time he shall devote the whole of his time, attention and abilities to the affairs of the Company and shall not be entitled to receive any additional remuneration for work performed outside normal business hours.

## 5.    REMUNERATION AND BENEFITS

5.1    For his services hereunder the Executive shall be paid a salary of $200,000 which shall accrue from day to day and be payable on a bi-weekly basis save that a pro rata payment shall be made in respect of any period of employment at the beginning or end




of his employment hereunder. Such salary shall be subject to periodical review at the Board's discretion.

5.2    The Executive will also be eligible for bonus payments and conditional rights to shares under any incentive scheme approved from time to time for this purpose by the Board.

5.3    The Company shall during the continuance of the Executive's employment hereunder contribute on the Executive's behalf to its health, dental, life and long term disability insurance schemes from time to time in force. The Executive will also be entitled to participate in the Company's retirement benefits plan.

5.4    The Company reserves the right to change, modify or cancel at its sole discretion from time to time any or all of said benefits.

## 6.    HOLIDAY

6.1    The executive shall be entitled to 20 days holiday (in addition to 11 USA statutory holidays) in each holiday year at full salary, to be taken at such time or times as may be approved in advance by his Line Manager. The holiday year runs from 1st January to 31st December.

## 7.    COMPANY CAR

The Company shall, during the term of this Agreement, provide the Executive with a car for his use in the business of the Company or any Group Company and shall bear all standing costs relating thereto including the cost of insuring, testing, taxing, repairing and maintaining the same and shall reimburse the Executive's running expenses of the car in accordance with the Company's rules and procedures for the time being in force. The cost of all fuel will be met by the Company, including reasonable private mileage in the USA.

## 8.    EXPENSES

The Company shall repay to the Executive all reasonable travelling and other expenses properly incurred by him in the performance of his duties hereunder in accordance with the Company's rules and procedures for the time being in force.

## 9.    INCAPACITY FOR WORK AND SICK PAY

9.1    If the Executive is absent as a result of sickness or injury he will comply with the Company's requirements for the time being in force as to notification of absence.

9.2    Providing that the Executive has completed six months' continuous service with the Company, the Executive will, subject to Clause 12.1 below, be entitled to be paid a salary of an amount which taken together with any Company long term disability, social security or other state benefits payable to him shall equal his normal salary under this Agreement during any periods of absence from work as a result of sickness

3

 

or injury up to a maximum of six months in aggregate in any twelve consecutive months, and to payment of a salary of an amount which together with such other benefits specified above shall be equal to half his normal salary under this Agreement during any further period of such absence up to a maximum of a further six months.

9.3    In the event that the Executive has completed less than six months' continuous service with the Company, the period for which full salary (adjusted for social security or other state benefits as provided in Clause 9.2 above) will be payable will be one month and thereafter the Executive will not be entitled to any further payment of salary.

## 10    MEDICAL EXAMINATION AND REPORT

The Executive shall at any time if directed to do so by his Line Manager submit to a medical examination by a qualified medical practitioner of the Company's choice and at its expense on the understanding that thereafter the said medical practitioner will prepare a written report of the results of any such examination and send the same to the Personnel Director and to the Executive.

## 11    NOTICE PERIOD

11.1    Save as provided for in Clauses 12.1, 12.2 and 12.3 below, the Executive's employment hereunder shall continue subject to the terms of this Agreement until terminated

    (a)    by the Company giving to the Executive not less than twelve months' written notice expiring at any time; or

    (b)    by the Executive giving not less than six months' written notice expiring at any time.

## 12.    TERMINATION OF EMPLOYMENT

12.1    If the Executive shall:

    (a)    be or become bankrupt or materially compound with his creditors; or

    (b)    be incapacitated from performing his duties for any continuous period of 180 calendar days or for a total period exceeding 125 working days in any period of twelve months;

then the Parent Company shall be entitled, within three months of the Parent Company becoming aware of one of the events specified at Clauses 12 above, to determine his employment under this Agreement on three months' notice whereupon the Executive shall have no claim against the Parent Company for damages or otherwise by reason of such determination. If his employment is determined under

4

 

Clause 12.1(b) for reasons of sickness or injury the Executive will additionally be entitled to receive at the end of a three month notice period the balance of any salary he would have been entitled to under Clause 9.2 for the unexpired period of twelve months from the first day of the relevant period of incapacity referred to in Clause 12.1(b).

12.2    The Parent Company may summarily terminate the Executive's employment hereunder without prior notice so that the Executive shall have no claim for damages or otherwise against the Parent Company in respect of such termination (but without prejudice to any other remedy which the Parent Company may have against the Executive) if the Executive shall:

    (a)    be convicted of any criminal offence other than:

        (i)    a summary offence under road traffic legislation for which a penalty other than imprisonment is imposed;  or

        (ii)    any other offence which, in the opinion of the Chief Executive does not affect his position as an employee of the Company (bearing in mind the nature of the duties for which he is engaged and the capacity in which he is employed); or

    (b)    commit or reasonably be believed, with credible factual support, by the Chief Executive to have committed any act of wilful dishonesty;  or

    (c)    commit any serious, wilful or persistent breach of any of his obligations to the Parent Company or any Group Company under this Agreement or commit any act which might seriously affect his ability thereafter to discharge his duties hereunder;  or

    (d)    be in the reasonable opinion of the Board failing in the performance of his duties;

    (e)    commit any wilful act or wilfully conduct himself in a manner which might or does bring the reputation of the Parent Company into question or disrepute.

12.3    The employment of the Executive shall terminate automatically on his reaching 65 years of age.

## 13    DUTIES ON TERMINATION

Upon termination of his employment with the Company for whatsoever reason the Executive shall without prejudice to any claim for damages or other remedy which either party might have against the other:

13.1    forthwith resign from any offices held by him in the Company or any other Group Company and in the event of his failure to do so the Board is hereby irrevocably authorised to appoint a person in his name and on his behalf to do all such things and

5



execute all such documents as may be necessary or desirable to bring about such resignation; and

13.2 immediately deliver up to the Company all correspondence, documents, specifications, papers, magnetic discs, tapes or other software storage media, credit cards, petrol cards and other property belonging to the Company or any other Group Company which may be in the Executive's possession or under his control (including such as may have been made or prepared by or have come into the possession or under the control of the Executive and relate in any way to the business or affairs of the Company or any other Group Company or of any supplier, agent, distributor or customer thereof) and the Executive shall not without the written consent of the Board retain any copies thereof;

13.3 immediately return to the Company in good condition any car provided to him pursuant to Clause 8 above and any other communication or computing equipment and peripheral devices belonging to the Company.

## 14 NON-ATTENDANCE

The Chief Executive may at any time during the term of the Executive's employment hereunder elect not to provide work for the Executive to do and/or require the Executive not to attend at the premises of any Group Company and no such event shall constitute a repudiation of this Agreement or dismissal of the Executive whether constructive or otherwise.

## 15 DISCIPLINE AND GRIEVANCE

15.1 There are no fixed disciplinary rules applicable to this Agreement. In the event that the Executive remains dissatisfied with any disciplinary action taken against him or has any grievance relating to his employment he should refer in the first instance to the Personnel Director. In the event that the Executive remains dissatisfied following such reference the matter may be referred in writing to the Chief Executive.

15.2 The Chief Executive shall be entitled to require the Executive to absent himself from any premises of the Company and any Group Company and to refrain from contacting any director or employee of any such Company or the respective suppliers, agents, distributors or customers of any such company for a period not exceeding one month for the purpose of investigating any allegations of misconduct by the Executive.

## 16 EXCLUSIVE SERVICES AND INTEREST IN SECURITIES

16.1 During the continuance of his employment under this Agreement the Executive shall not without the prior written consent of the Chief Executive directly or indirectly invest or participate in the management of, or in any capacity provide services to, any business PROVIDED THAT nothing in this clause shall preclude the Executive from holding or acquiring by way of a bona fide investment only, an interest not exceeding five per cent of any class of securities in (i) a company any part of whose share capital is listed or dealt in on a recognised stock exchange, or (ii) any other company whose business does not compete with any business carried on by any Group Company.

6



16.2   Whilst employed by the Company, the Executive will not (and will procure, as far as he is able, that his wife and children under 18 years of age will not) deal or become or cease to be interested in any securities of the Parent Company except in accordance with the Parent Company's code of practice for the time being in relation to such transactions, a copy of which can be obtained from the Company Secretary of the Parent Company.

## 17   CONFIDENTIALITY

17.1   The Executive shall not during his employment by the Company or thereafter (save as required for the proper performance of his duties or unless authorised to do so by his Line Manager or by a Court of competent jurisdiction) use or disclose to any third party, and shall use his reasonable endeavours to prevent publication or disclosure of and shall keep confidential, any confidential information concerning the business, technical processes, designs or finances of the Company or any Group Company or any customer or other person having dealings with the Company or any Group Company which comes to his knowledge during the course of his employment with the Company or any Group Company.

17.2   The Executive shall take all reasonable endeavours to ensure that he shall not during the continuance of his appointment make any statement (whether written or oral) to any representative of television, radio, film or other similar media and shall not write any article for the press or otherwise for publication on any matter connected with or relating to the business of the Company or any Group Company should any such statement be prejudicial to the business dealings of the Company, may have an impact on the share price of the Company or otherwise be deemed to bring the reputation of the Company or the Group into disrepute without first (in the case of written statements) obtaining the approval of the Chief Executive.

## 18   MISREPRESENTATION

The Executive shall not at any time make any untrue statement in relation to the Company or any Group Company, and in particular shall not after the termination of his employment hereunder wrongfully represent himself or permit himself to be held out as being employed by or connected with the Company or any other Group Company.

## 19   RE-ORGANISATION

Should the Company (or any Group Company) undergo any process of reconstruction, amalgamation or administrative re-organisation (whether or not involving the liquidation of the Company), and should in the process the Executive's job cease to exist or the scope or title be varied or it appears desirable to the Company or its Holding Company that the Executive should be employed by some other Group Company then, provided that the terms and conditions of service (other than the duties involved in the job) offered to the Executive in respect of the proposed new employment or his existing employment as varied, as the case may be, are, taken as a whole, not less advantageous to him than those contained herein and

7




the duties thereof are within his capabilities and of a nature which in the circumstance it is not unreasonable to expect the Executive to perform, the Executive shall (whether or not he accepts such alternative or varied employment) except as allowed by statute, have no claim for compensation against the Company in respect of the termination or variation (actual or proposed) of his employment hereunder.

## 20    OTHER AGREEMENTS

20.1    This Agreement takes effect in substitution for all previous agreements and arrangements whether written, oral or implied between the Company and the Executive relating to the Executive which agreements and arrangements shall be deemed to have been terminated by mutual consent and without liability on either side as from the date of this Agreement. Except as otherwise provided by this Agreement, there are no terms or conditions of employment relating to hours of work or to normal working hours or to entitlement to holidays (including public holidays) or holiday pay or to incapacity for work due to sickness or injury or to pensions or pension schemes.

20.2    There are no collective agreements which affect the Executive's terms and conditions of employment under this Agreement.

## 21    NOTICES

Any notice in writing to be served hereunder may be given personally to the Executive, the Chief Executive (as the case may be) or may be posted by first class post to the Parent Company (for the attention of the Chief Executive) at its registered office for the time being or to the Executive at his last known address. Any such notice sent by post shall be deemed served 48 hours after it is posted and in proving such service it shall be sufficient to prove that the notice was properly addressed and put in the post.

## 22    RESTRICTIONS

22.1    For the purposes of this Clause 22 a "Relevant Employee" means any person:

(a)    employed by any Group Company at the time the Executive's employment under this Agreement ceases; and

(b)    for whom the Executive was responsible or with whom he had dealings; and

(c)    whose duties involved contact with or influence over customers or clients of any Group Company, or who held confidential information about any Group Company.

22.2    The Executive undertakes that for a period of twelve months from the time his employment with the Company ceases he will not directly or indirectly:

(a)    induce or procure any Relevant Employee to leave his employment with any Group Company, nor will he attempt to do so

8

 

(b)     employ, engage or otherwise deal with any Relevant Employee for the purpose of any business or activity which is directly or indirectly in competition with any business or activity carried out by any Group Company

nor will he assist in any such matter.

22.3    The Executive undertakes that for a period of twelve months from the time his employment with the Company is terminated he will not, either on his own behalf or on behalf of any other person, firm or company, solicit the custom or business of any person, undertaking, firm or company which was:

(a)     a client or customer of any Group Company at any time in twelve months immediately preceding the termination of his employment

(b)     and with which the Executive or any Relevant Employee reporting directly or indirectly to him had dealings or over which he or they had influence on behalf of any Group Company

nor will he assist in any such matter.

22.4    The Executive further undertakes that for a period of twelve months from the time his employment with the Company is terminated he will not, either on his own behalf or on behalf of any other person, firm or company, solicit the custom or business of any person, undertaking, firm or company which was:

(a)     negotiating or discussing with any Group Company at any time in the twelve months immediately preceding the termination of his employment the purchase or supply of products or services from any Group Company

(b)     and with which the Executive or any Relevant Employee reporting directly or indirectly to him had dealings or over which he or they had influence on behalf of any Group Company

nor will he assist in any such matter.

22.5    The Executive further agrees by way of separate and severable obligation that the foregoing restrictions shall apply in like manner as if the word "accept" were substituted for "solicit".

23      **SEVERABILITY**

23.1    In view of his appointment hereunder as President, US for the Company, the Executive acknowledges that the provisions of Clause 22 are reasonable in the interests of the parties to enable the Company or any other Group Company to protect its legitimate interests in its confidential information and trade connections. Accordingly, it is hereby further agreed that the obligations thereunder shall be separate and severable and if any such obligation shall nevertheless be adjudged to be invalid as going beyond what is reasonable but would be valid if any part of the wording thereof were deleted or the periods (if any) thereof were reduced or the range

9




of products or services were reduced in scope or restrictions on the scope t̶ were to be inserted the said obligations shall accordingly be read and apply with modifications as may be necessary to make them valid and effective.

23.2    If any restriction contained in this Agreement is found to be unenforceable then this Agreement shall continue to have effect with such minimum amendments as are necessary to render the provisions in question reasonable and enforceable.

24    **LAW APPLICABLE**

This agreement shall be governed by and construed in accordance with the laws of the Commonwealth of Pennsylvania.

10

 

**SIGNED AS A DEED** the day and year first above mentioned.

The Executive                    *David E. Chardavoyne*

Chairman
(Thames Water Holdings Inc

**SIGNED AS A DEED**
by the Executive
in the presence of:                    *John M. Stokes*

11