

## SEPARATION AGREEMENT

### 1. Parties and Definitions.

1.01   The word "Company" means any one or more of Thames Water Holdings Incorporated, Two Stamford Plaza, 281 Tresser Boulevard, Fifteenth Floor, Stamford, Connecticut 06901, Thames Water Americas, 1101 Laurel Oak Road, Suite 120, Voorhees, New Jersey 08043, Thames Water, Plc, Clearwater Court, Vastern Road, Reading, Berkshire RG1 8DB, United Kingdom, RWE AG, Opernplatz 1, 45128 Essen, Germany or related corporations, associations, or entities (by any one or more of licensing, ownership, or control). In addition, "Company" includes any one or more of its officers, directors, shareholders, trustees, members, employees, agents, or contractors. Finally, "Company" also means any one or more of the heirs, successors, assigns, or legal representatives of any one or more of the entities or persons mentioned in this paragraph.

1.02   The word "Releasor" means David E. Chardavoyne, 27 Coventry Lane, Trumbell, Connecticut 06611, an individual, and any one or more of his heirs, executors, assigns, or legal representatives.

1.03   The words "Parties" or "Party" mean either the Company or the Releasor, or both.

1.04   The word "Claim" means any one or more of indebtedness, claims, damages, causes of action, suits for legal or equitable relief, costs, attorneys' fees, or liabilities of every nature and description and either direct or consequential. The word "Claim" further includes any causes of action arising under any one or more of common law, statutes, regulations, executive orders, or ordinances (including, without limitation, any one or more of the Labor Management Relations Act, Fair Labor Standards Act, Title VII of the Civil Rights Act of 1964, the Civil Rights Act of 1871, the Civil Rights Act of 1866, the Civil Rights Act of 1991, the Rehabilitation Act of 1973, the Age Discrimination in Employment Act of 1967, the Americans with Disabilities Act of 1990, the Family and Medical Leave Act of 1993, False Claims Act, Connecticut Human Rights and Opportunities Law, Connecticut Equal Pay Law, Connecticut Reproductive Hazards Law, Connecticut Family and Medical Leave Law, New Jersey Law Against Discrimination, New Jersey Equal Pay Act, New Jersey Genetic Privacy Act, New Jersey Family Leave Act, any one or more of laws, regulations, executive orders, or ordinances enacted by federal, state or municipal governments, or any one or more of them, regulating, without limitation, any one or more of labor relations, employment relations, employment discrimination, fair employment practices, human rights, civil rights, wages, hours of work, occupational safety and health, retaliatory discharge, or any other aspect of employment). The word "Claim" further includes any one or more of causes of action, complaints, charges, or rights enforceable in any forum, whether a court or an administrative agency. The word "Claim" further includes any contract claims, such as and without limitation, any claims based upon any contract between the Parties, except for this agreement, whether oral or written, or both. The word "Claim," however, excludes workers' compensation injury claims.

1.05   The words "Settlement Sum" mean severance pay for twelve months paid at the

 

cost for continuing the Releasor's health plan benefits for twelve months, and a lump sum to be paid upon the expiration of the Releasor's rescission right, as stated in §3.21.

1.06    The words "Confidential Information" mean any one or more of the Company's customers' names, business plans, financial information, customers' records, personnel records, marketing plans, pricing information, cost data (*e.g.*, any one or more of financial models, valuation models, OPEX, or CAPEX), operational methods, forms, products, services, techniques, business methods (including new applications of known business methods), merger and acquisition information or integration plans, or both, research regarding existing or planned either products or services, products or services under development, proprietary information, trade secrets, profit margins, tax records, software, source codes, object codes, or executable codes.

## 2. Recitals.

2.01    The Company initially employed the Releasor on February 15, 1999 as the president of Thames Water Holdings Incorporated pursuant to a written employment agreement. A copy of that employment agreement accompanies this agreement as an attachment entitled Exhibit A. When his employment ended, the Releasor held the same position.

2.02    On May 29, 2002, the Company told the Releasor of its elimination of his position. The employment agreement between the Parties requires the Company to give the Releasor twelve months' advance notice of the termination of his employment for reasons other than cause. It further allows the Company to assign no duties to the Releasor during the notice period. The Parties' employment agreement also prohibits the Releasor from having any other employment during the notice period. It further imposes restrictions on the Releasor's competitive activities for an additional period of twelve months after the notice period ends.

2.03    This agreement restructures the Parties' obligations in view of the elimination of the Releasor's job. It abandons the notice period to terminate the Releasor's employment and allows him to have non-competitive employment immediately. This agreement's Settlement Sum further provides enhanced economic benefits to the Releasor as compared to the termination of his employment with notice pursuant to the Parties' employment agreement. The Parties have prepared this agreement to put their separation agreement in a formal and final form.

2.04    The Company gave this agreement to the Releasor on May 29, 2002. In so doing, it told the Releasor to consult his own lawyer for advice about this agreement. The Company further informed the Releasor that he could take until the close of business on June 19, 2002 to decide whether he would accept this agreement. The Releasor acknowledges his voluntary acceptance of this agreement after an ample opportunity to consult a lawyer of his choice.

2.05    The Parties desire to compromise all of the Releasor's Claims against the Company. In consideration of this agreement, the Parties each accept its provisions.

 

### 3. Rights and Duties of the Parties.

3.01  The Releasor releases the Company and all other persons and entities from liability for all of his Claims against the Company. The release in this paragraph includes, without limitation, any Claim that the Releasor has or may have because of any one or more of acts, omissions, transactions, or occurrences that involve any aspect of either the Releasor's employment with the Company or its termination, or both.

3.02  The Releasor waives any right of his to sue the Company and all other persons and entities on all of his Claims against the Company. The waiver of the right to sue in this paragraph includes, without limitation, any Claims that the Releasor has or may have because of any one or more of acts, omissions, transactions, or occurrences that involve any aspect of either the Releasor's employment with the Company or its termination, or both.

3.03  The Company shall pay the Settlement Sum to the Releasor in accordance with this paragraph's provisions after his revocation right pursuant to this agreement's §3.21 expires unexercised. Upon the expiration of the Releasor's revocation right, the Company shall issue a check payable to the Releasor in the amount of $50,000 less all withholding required by law in full payment of the Settlement Sum's lump sum. The Company shall send that check to the Releasor by mail at his address stated in §1.02. The Company shall also begin the payment of the Settlement Sum's severance pay on its next regular payday that follows the expiration of the Releasor's revocation right by at least five business days. The Company shall make payments of the Settlement Sum's severance pay in equal installments on its regular paydays. Its payment of those installments shall end when their gross amount equals $227,000.

3.04  The Releasor shall fulfill the Company's reasonable requirements for him to make an election to continue his health plan coverage in the Company's group health plan pursuant to the Consolidated Omnibus Reconciliation Act of 1985, as amended ("COBRA"). The Company shall pay all costs related to the continuation of the Releasor's health plan coverage pursuant to COBRA with the same coverage as he had as of May 1, 2002 for twelve months. The Company shall begin making such payments to its group health plan provider after the Releasor's revocation right pursuant to §3.21 expires unexercised. At the end of the first twelve months of COBRA continuation coverage, the Releasor may continue his health plan coverage in the Company's group health plan for six more months. To do so, he must pay the full cost for such coverage in monthly installments to the Company before the first calendar day of each month.

3.05  The Company admits no liability to the Releasor by entering into this agreement. The Parties, by this agreement, have compromised any existing or potential disputed Claims by the Releasor against the Company. In so doing, the Parties intend to extinguish all rights and liabilities concerning any Claims by the Releasor against the Company because of any one or more of acts, omissions, transactions, or occurrences in any way concerning or arising from either the Releasor's employment with the Company or such employment's termination, or both.

3.06  The Company has eliminated the Releasor's job effective the close of business on May 29, 2002. Simultaneously with the elimination of the Releasor's position as President of Thames Water Holding Incorporated, the Company has removed him from each of the officer

 

has revoked the Releasor's authority to represent the Company in the capacity of an officer or a director of any committee or organization outside of the Company. Consequently, the Releasor shall resign any positions that he has held to represent the Company as either an officer or director, or both, of any third party organizations or committees. After May 29, 2002, the Releasor shall neither speak nor act, or both, as the Company's representative without prior written authorization to do so from the chief executive officer of Thames Water, Plc.

3.07  Except for the factual information described in paragraphs 1.01, 1.02, 2.01, and the first sentence of paragraph 2.02, the Releasor shall disclose neither this agreement's existence nor any of its provisions, or both, to any one or more of the Company's employees, agents, or contractors not involved in this agreement's either negotiation or execution, or both, or non-Parties (except any one or more of his attorneys, accountants, or spouse who agree in advance not to reveal any of this agreement's provisions in accordance with the Releasor's nondisclosure duty). If, however, either legal process or a legal duty requires the Releasor to disclose either this agreement's existence or any of its provisions, or both, then he may make any disclosure reasonably necessary to fulfill any such legal obligation only. If the Releasor (or any one or more or his attorneys, accountants, or spouse) breaches the obligations imposed by this paragraph, then the Company shall have the right to recover liquidated damages pursuant to this agreement's paragraph 4.02.

3.08  The Releasor shall avoid any disparagement of any one or more of the Company, its products, or its services. If the Releasor breaches his duty imposed by this paragraph, then the Company shall have the right to recover liquidated damages pursuant to this agreement's paragraph 4.02.

3.09  The Releasor waives any right that he either has or may have to employment with the Company now or in the future. He further shall make no applications for employment with the Company in the future. If the Releasor submits an application for employment with the Company after his acceptance of this agreement, then the Company shall have the right to hire any other applicant without liability to the Releasor. He, furthermore, shall have no Claim against the Company, because it hired an applicant other than him.

3.10  The Releasor shall provide no services to any person or entity that sells, leases, offers for either sale or lease, or both, or otherwise provides either products or services, or both, competitive to the Company's without its express written consent. The Releasor shall further avoid any association as any one or more of an officer, director, stockholder, partner, agent, employee, independent contractor, consultant, adviser, or otherwise with any either any person or entity that sells, leases, offers for either sale or lease, or both, or otherwise provides either products or services, or both, competitive to the Company's without its express written consent. This prohibition bars any such associations irrespective as to whether the Releasor receives any compensation because of them. The geographic scope of this restriction covers the area coextensive with both the United States of America and Puerto Rico. The duration of the restrictions in this paragraph shall cover the period of twelve months immediately after the Releasor's employment with the Company ends. The Releasor, however, may own shares of publicly traded stock listed on any *bona fide* stock exchange in one or more of the Company's competitors during the period of this paragraph's restrictions, if the Releasor's holding of shares



    3.11    The Releasor shall avoid any contact with the Company's customers to sell, to lease, to solicit, to offer for sale or lease, to consult, or otherwise to provide them with either products or services, or both, competitive to the Company's. The Company's customers mean any business, organization, or person to whom it has supplied either goods or services, or both, in the 12 months preceding the termination of the Releasor's employment with the Company. The duration of the restrictions in this paragraph shall cover the period of twelve months immediately after the Releasor's employment with the Company ends.

    3.12    The Releasor recognizes the Company's legitimate interest in the Confidential Information. The Releasor shall not disclose Confidential Information to any person or entity. The Releasor shall also make no use of Confidential Information for the Releasor's own benefit or otherwise.

    3.13    The Releasor shall immediately give notice to the Company of any unauthorized possession, use, or knowledge of any Confidential Information by any person or organization, including any of the Company's employees. The Releasor shall promptly furnish full details of any such unauthorized possession, use, or knowledge of Confidential Information to the Company. The Releasor shall provide assistance to the Company to prevent the recurrence of any such unauthorized use, possession, or knowledge of Confidential Information. The Releasor shall also cooperate with the Company in any litigation against third parties that it brings or defends to protect Confidential Information.

    3.14    All recorded Confidential Information and documents (or copies of them), equipment, components, parts, tools, and so forth, shall remain the Company's property after the Releasor's employment with the Company ends. The Releasor shall return all of the Company's property and any record of any Confidential Information either in the Releasor's possession or under the Releasor's control, or both to the Company.

    3.15    This agreement's obligations involving Confidential Information have the following limitations. First, Confidential Information that becomes known publicly, such as through publication in the media or otherwise, through neither the Releasor's act nor his omission loses its status as Confidential Information. The exception stated in the preceding sentence excludes, however, general disclosures in the public domain of Confidential Information that concern specific techniques, equipment, processes, forms, products, services (whether existing, planned, or under development), and business methods (including new applications of known business methods). Similarly, this paragraph's exceptions to Confidential Information exclude a combination of specific information that includes individual items of information in the public domain, unless the combination itself and its principles of operation are in the public domain. Second, if either legal process or a legal duty requires the Releasor to disclose Confidential Information, then the Releasor may do so but only to the extent reasonably necessary for him to satisfy his legal obligation of disclosure. Before making any disclosure of Confidential Information because of either legal process or a legal duty, the Releasor shall give advance, written notice of his intention to disclose the Confidential Information and of the nature of the legal process or legal obligation requiring the Releasor to make a disclosure to the

requiring the Releasor's disclosure of Confidential Information, then the Releasor shall cooperate with and assist the Company in that challenge.

3.16   In the period of twelve months immediately following the termination of his employment with the Company, the Releasor shall avoid any one or more of soliciting, recruiting, or encouraging any of the Company's employees either to terminate his or her employment or to seek employment with an employer other than the Company. This restriction shall only prohibit the Releasor from any one or more of such soliciting, recruiting, or encouraging those of the Company's employees who began their employment before the Releasor's employment with the Company ended.

3.17   The Releasor recognizes that the limitations imposed upon the Releasor in this agreement's §3.07, §3.08, and §3.10 through §3.16 involve reasonable restrictions. The Releasor further acknowledges that none of them either alone or together will prevent the Releasor from earning a livelihood during the twelve months immediately after the end of the Releasor's employment with the Company.

3.18   The Parties, moreover, intend to restrict The Releasor's conduct consistently with the provisions of §3.07, §3.08, and §3.10 through §3.16. If, however, a court construes any one or more of such provisions to state unreasonable restrictions, then they request the court to revise such restrictions to make them reasonable and enforceable to the maximum extent permissible.

3.19   If the Releasor has not already done so, then the Releasor shall return all of the Company's business property either in the Releasor's possession or under his control to the Company by May 31, 2002. Such property includes, without limitation, any one or more of the Company's corporate credit cards, keys to any one or more of the Company's facilities, offices, office furniture, or filing cabinets, the Company's equipment that it provided to the Releasor (such as and without limitation, any one or more of telephones, pagers, facsimile machines, or computers), documents that the Releasor prepared in the course of his performance of his job duties with the Company, and any either documents or other media capable of storing information, or both, that contain Confidential Information.

3.20   The Company provided a vehicle to the Releasor for business-related his use during his employment. That vehicle has the following vehicle identification number: 1LNHM87A62Y672200. The Releasor may continue his use of that vehicle until July 31, 2002. He shall then return that vehicle to the Company in clean and good operating condition. Through the remainder of the time that the Releasor uses the vehicle provided to him by the Company, the Releasor shall pay the costs of all fuel, oil, liability insurance, maintenance, and repairs. The Releasor shall submit any expenses he incurred related to his business use of this vehicle before May 30, 2002 to the Company for reimbursement by May 31, 2002. The Company shall reimburse the Releasor for those expenses consistent with its policies regarding the reimbursement of business-related expenses by June 15, 2002.

3.21   The Parties' rights and duties established by this agreement shall take effect on the eighth day after the Releasor's full execution of this agreement without having previously




### 4. Remedies for Breach of the Agreement.

4.01   If the Releasor breaches or threatens to breach his obligations under this agreement, then the Company shall experience irreparable harm for which money damages alone will not provide an adequate remedy. Accordingly, the Company shall have the right to equitable relief in addition to legal relief to remedy any such breach or threatened breach. By seeking a restraining order or injunction first, however, the Company shall not make an election of remedies and may pursue an action at law, either simultaneously or later.

4.02   Because of the difficulty in determining the amount of any damages that the breach of any one or more of this agreement's §3.06, §3.07, §3.08, §3.10, §3.11, §3.12, §3.13, §3.14, §3.15, or §3.16 would cause, the Parties establish a sum equal to the $50,000 as liquidated damages for any such breach of the agreement. The Parties have fixed the liquidated damages as a good faith estimate of the minimum actual damages that any such breach would produce and not as a penalty. Such liquidated damages shall be due and payable without demand beginning on the date of any such breach.

4.03   In any enforcement action, the losing Party shall pay the prevailing Party's attorneys' fees and costs incurred to enforce this agreement. The court shall specifically determine the prevailing Party in any such enforcement action. The court shall declare any Party that either obtains all of the relief that it or he sought or that defeats the other Party's enforcement action entirely to be the prevailing Party. In any case where the court awards some relief to both Parties, then it shall declare the Party that obtained more relief than the other Party, the prevailing Party. If both Parties obtained either substantially the same amount of or no relief in the enforcement action, then the court shall find no prevailing Party.

### 5. Miscellaneous.

5.01   This agreement includes all of the Releasor's Claims against the Company concerning either the Releasor's employment with the Company or such employment's termination, or both. It covers all of such Claims, whether they are known or unknown and whether they are ascertainable at the time of its execution. This agreement reflects the Parties' entire agreement regarding the termination of the Releasor's employment with the Company, and it merges all agreements, representations, and understandings between the Parties, whether oral or written, or both.

5.02   The laws of the State of New Jersey shall govern the interpretation of this agreement, except for its laws regarding conflict of law.

5.03   If a Party pursues either legal or equitable relief, or both, to resolve a dispute between the Parties arising under or relating to this agreement, that Party shall bring such an action only in the United States District Court for the District of New Jersey, Camden Vicinage.

5.04   The Parties shall give all notices, whether voluntary or mandatory, in writing. The




Releasor shall address any notices to the Company to Matthew Huckin, or his successor at the following address:

>Mr. Matthew Huckin
>Human Resources Director
>Thames Water Americas
>1101 Laurel Oak Road
>Suite 120
>Voorhees, New Jersey 08043

Either Party may serve a notice to the other Party either personally upon a signed receipt or by certified mail with return receipt requested. A Party sending a notice by certified mail with return receipt requested shall also send a copy of that notice to the other Party by regular first class mail. The Parties may also give notices by facsimile, if available. A Party may change its address for the receipt of notices by giving the other Party a notice of a change of address for notices. One Party's notice to the other Party shall take effect upon its reception by the other Party, except for notices sent by mail. The earlier of the recipient's actual receipt of the notice or the date occurring three calendar days after the notice's postmark shall establish the notice's date of receipt.

5.05   A photocopy of this fully executed agreement shall have the same effect and validity as an original.

5.06   The following principles shall control the interpretation of this agreement. The singular shall also mean the plural. Similarly, the plural shall include the singular. Pronouns of either or no gender shall also mean the masculine, feminine, and neuter.

5.07   The Parties accept each provision of this agreement. Any invalid provision shall not invalidate the remaining provisions. If, however, any court, at the Releasor's request, finds either paragraph 3.01 or paragraph 3.02, or both, to be void or otherwise invalid, then the Company shall have the right to rescind this agreement. To do so, it shall give the Releasor a notice of its rescission of the agreement. Upon any such rescission of this agreement, the Releasor shall immediately repay the entire Settlement Sum to the Company without any demand for such payment. Interest shall accrue, furthermore, at the highest legal rate from the date of any such rescission.

 

IN WITNESS OF THIS AGREEMENT, the Parties have executed it below.

COMPANY:

By_____
Matthew Huckin

Dated: May __, 2002

RELEASOR:

_____
David E. Chardavoyne

Dated: May __, 2002

 

# ACKNOWLEDGMENTS

STATE OF NEW JERSEY        )
                           ) ss.
COUNTY OF CAMDEN           )

    On this ____ day of May 2002, Matthew Huckin appeared personally before me. I know him to be an authorized representative of the Company. After being duly sworn on his oath by me, he acknowledged that he had read the preceding separation agreement. He further declared that he executed it voluntarily and on behalf of Thames Water Holdings Incorporated, Thames Water Americas, Thames Water Plc, and RWE AG as their authorized agent for the purposes stated in the agreement.

    IN TESTIMONY OF THESE ACTS, I have signed my name and affixed my official seal to this document on the date and in the county and state written above.

                                                                                 Notary Public

My Commission Expires:


STATE OF CONNECTICUT       )
                           ) ss.
COUNTY OF FAIRFIELD        )

    On this ____ day of May 2002, David E. Chardavoyne, who is known to me, personally appeared before me. After being duly sworn on his oath, he acknowledged that he had read the preceding separation agreement and understood it. He further declared that he executed it voluntarily for the purposes stated in the agreement.

    IN TESTIMONY OF THESE ACTS, I have signed my name and affixed my official seal to this document on the date and in the city and state written above.

                                                                                 Notary Public

My Commission Expires:

## CERTIFICATION

This is to certify that a true and correct copy of the foregoing was delivered by United States Mail, first class, postage-prepaid to the following this 4th day of June, 2008:

Stephen P. Fogerty, Esq.
Halloran & Sage LLP
315 Post Road West
Westport, Connecticut 06880

Ralph W. Johnson, III, Esq.
Halloran & Sage LLP
One Goodwin Square
225 Asylum Street
Hartford, CT 06103

_____
Patrick J. McHugh

{00325741; 3; 1103-2}