IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| DAVID E. CHARDAVOYNE | : | |
| Plaintiff, | : | CIVIL ACTION NO. |
| | : | 3:03-CV-56 (WWE) |
| VS. | : | |
| | : | |
| THAMES WATER HOLDINGS | : | |
| INCORPORATED, THAMES WATER | : | |
| NORTH AMERICA, INC. | : | |
| Defendants. | : | JULY 16, 2008 |

## DEFENDANT'S LOCAL RULE 56(a)1 STATEMENT IN SUPPORT OF ITS MOTION FOR JUDGEMENT ON THE PLEADINGS AND TO THE EXTENT NECESSARY MOTION FOR SUMMARY JUDGMENT

Pursuant to Local Rule 56(a)1, the defendant, Thames Water Holdings Incorporated ("TWH"), submits this statement of undisputed facts in support of its motion for judgment on the pleadings and to the extent necessary, motion for summary judgment directed to the plaintiff's Fourth Amended Complaint. Specifically, in support of the instant motion, TWH incorporates by reference the Local Rule 56(a)1 statement it filed on December 16, 2005 and the separate appendix of exhibits (1 through 18) filed on that same date.

In addition to its first Local Rule 56(a)1 statement, TWH maintains that the following facts are not disputed for purposes of the instant motion:

1.      As part of the defendants' first motion for summary judgment, they submitted an appendix of exhibits dated December 16, 2005. (Docket Entry No. 85) As part of Exhibit 10A within that appendix, the defendants submitted a letter dated June 10, 2002 from their attorney, Gerald Richardson, to the plaintiff's attorney. The letter, which was quoted in the Court's March 5, 2007 Ruling and April 24, 2008 Memorandum of Decision stated, in relevant part, as follows:

> The Agreement ... allows the Company to provide
> no work to Mr. Chardavoyne and to require him to
> stay away from its premises in its non-attendance
> provisions. Assuming the absence of a separation
> agreement, then the Company began its exercising
> of its rights pursuant to the Agreement's non-
> tenants provisions effective May 29, 2002. On that
> date, the Company clearly communicated its
> elimination of Mr. Chardavoyne's job, which left
> him with no duties to perform. In addition, it told
> him of its expectations for him to remove his
> personal belongings from the Company's premises
> and to return all of the company's property in his
> possession or under his control.

2.     Another copy of Attorney Richardson's letter is attached hereto as Exhibit A.

3.     As part of the defendants' first motion for summary judgment, they submitted an appendix of exhibits dated December 16, 2005. (Docket Entry No. 85) As part of Exhibit 9 within that appendix, the defendants submitted a letter dated June 10, 2002 from the plaintiff to Matthew Huckin. By that letter, the plaintiff returned to TWH two credit cards and a telephone card that had been provided as part of his employment.

4.     Another copy of the plaintiff's June 10, 2002 letter is attached hereto as Exhibit B.

5.     As part of the defendants' first motion for summary judgment, they submitted an appendix of exhibits dated December 16, 2005. (Docket Entry No. 85) As part of Exhibit 7 within that appendix, the defendants submitted excerpts from the plaintiff's deposition transcript.

6.     In his deposition, the plaintiff confirmed that after the May 29, 2002 meeting with James McGivern and Matthew Huckin, he did not return to TWH's office because he knew that the locks had been changed so he could not get into TWH's office. (Pl.'s Depo. Tr. at 108-09) Moreover, on June 10, 2002, the plaintiff mailed Huckin two credit cards and a telephone card

2

that had been provided as part of his employment. (Pl.'s Depo. Tr. at 115; Pl.'s 6/10/02 Letter)

The plaintiff returned the cards because the company wanted them back. (Pl.'s Depo. Tr. at 115-

16) In his deposition, the plaintiff further confirmed that the company told him more than once

to return the company car he was provided under the Employment Agreement. (Id. at 116, 157)

      7.     Additional copies of the pages from the plaintiff's deposition transcript cited

above and previously on file with the Court, are attached hereto collectively as Exhibit C.

          Respectfully submitted,

          **THE DEFENDANT**
          **THAMES WATER HOLDINGS,**
          **INCORPORATED**


By:    _____

          Stephen P. Fogerty
          CT Fed. Bar No. 01398
          **HALLORAN & SAGE LLP**
          315 Post Road West,
          Westport, CT 06880
          Tele: (203) 227-2855
          Fax: (203) 227-6992
          E-mail: Fogerty@halloran-sage.com

               and

          Ralph W. Johnson III
          CT Fed. Bar No. 15277
          **HALLORAN & SAGE LLP**
          One Goodwin Square
          225 Asylum Street
          Hartford, CT 06103
          Tele: (860) 522-6103
          Fax: (860) 548-0006
          E-mail: Johnsonr@halloran-sage.com

          Its Attorneys

# EXHIBIT A

# THE LOWENBAUM PARTNERSHIP, L.L.C.

222 South Central Avenue
Suite 901
St. Louis, Missouri 63105
(314) 863-0092
Facsimile: (314) 746-4848

Gerald M. Richardson
(314) 746-4830
gmr@lowenbaumlaw.com

June 10, 2002

FACSIMILE TRANSMISSION:
(203) 348-5777

James R. Hawkins II
Finn Dixon & Herling LLP
One Landmark Square
Stamford, Connecticut  06901-2689

      Re:    David E. Chardavoyne

Dear Mr. Hawkins:

This firm represents Thames Water and its subsidiary companies in the Americas Region ("Company") in labor and employment related legal issues. Matthew Huckin has referred your letter to him dated June 3, 2002 to me to provide the Company's response.

The Company views Mr. Chardavoyne's rejection of its separation agreement offer and his counterproposal as wholly unrealistic. Of course, Mr. Chardavoyne may reject the Company's offer. That circumstance, however, leaves him in the position of his having his employment terminated without cause pursuant to the employment agreement between him and the Company dated January 15, 1999 ("Agreement").

Pursuant to the Agreement, the Company has the unqualified right to terminate Mr. Chardavoyne's employment without cause upon giving him twelve months' advance notice. The Company's communication of its intention to terminate his employment without cause in conjunction with its separation agreement offer initiated the beginning of the notice period if the parties reach no separation agreement. Consequently, absent such an agreement, Mr. Chardavoyne's employment ends on May 29, 2003.

The Agreement, moreover, allows the Company to provide no work to Mr. Chardavoyne and to require him to stay away from its premises in its non-attendance provisions. Assuming the absence of a separation agreement, then the Company began its exercising of its rights pursuant to the Agreement's non-attendance provisions effective May 29, 2002. On that date, the Company clearly communicated its elimination of Mr. Chardavoyne's job, which left him with no duties to perform. In addition, it told him of its expectation for him to remove his personal belongings from the Company's premises and to return all of the Company's property in his possession or under his control.

If the parties ultimately reach no separation agreement, the Company will continue to pay the base salary at the rate of $227,000 annually less all withholding required by law to Mr. Chardavoyne

TW 00428

REDACTED

Mr. James R. Hawkins II
June 10, 2002
Page 2

through May 29, 2003. The Company will also continue Mr. Chardavoyne's participation in its benefit plans. It, however, will give him and his dependents notices of the continuation of their health plan coverage pursuant to the Consolidated Budget Reform Act of 1985 ("COBRA") in the near future. The Company will pay that part of the COBRA continuation costs equivalent to the sums that it paid as the employer on behalf of Mr. Chardavoyne and his dependents before May 29, 2002 to continue their health plan coverage through May 29, 2003. In addition, the Company will withhold a sum equal to his contribution to health plan costs that the Company withheld from his paycheck before May 29, 2002 from its payments to him during the notice period.

In the absence of a separation agreement, Mr. Chardavoyne must take his accrued but unused vacation days that he had as of May 29, 2002 as vacation time during the notice period. As previously stated, furthermore, Mr. Chardavoyne will receive payments equal to his salary for one year, and he will have no duties. Consequently, any vacation that he will accrue between May 29, 2002 and May 29, 2003, or that he has accumulated prior to May 29, 2002 the Company requires him to take before May 29, 2003.

Mr. Chardavoyne is eligible, under the company bonus plan rules, to receive a bonus for the performance of his business unit and for his performance in relation to his personal targets, up to the date of termination, May 29, 2002. Bonus decisions are made in April of the following year to the calendar performance year in question. If at that time (April 2003) a bonus is deemed payable to Mr. Chardavoyne it will be paid with his April 2003 salary payment. The long-term incentive plan is a discretionary plan in which the Chief Executive Officer has the sole decision-making authority. The Chief Executive has exercised his discretion and chosen not to make any award to Mr. Chardavoyne.

In addition, the Agreement limited the Company's responsibility to provide a car to Mr. Chardavoyne to a specific purpose. In particular, it states: "The Company shall ... provide the Executive with a car for his use in the business of the Company or any Group Company." If the parties reach no separation agreement, Mr. Chardavoyne lacks any need for the Company to furnish a car to him. He will do nothing between now and May 29, 2003 that would require his "use [of a car] in the business of the Company." Consequently, Mr. Chardavoyne has no right pursuant to the Agreement to a car during the notice period.

In the absence of a separation agreement, moreover, Mr. Chardavoyne has restrictions on his activities that bind him for a period of two years. During the period between May 29, 2002 and May 29, 2003, Mr. Chardavoyne cannot have any either self-employment or other employment. Pursuant to the Agreement's provisions regarding the hours of work, he must "devote the whole of his time, attention and abilities to the affairs of the Company." In addition, the Agreement imposes the following restrictions on his provision of services to any other employers:

> [T]he Executive shall not without the prior written consent of the Chief Executive
> directly or indirectly invest or participate in the management of, or in any capacity
> provide services to, any business.

Between May 29, 2003 and May 29, 2004, furthermore, the Agreement prohibits Mr. Chardavoyne from certain competitive activities. First, it forbids his either soliciting or accepting any business from the Company's either customers or prospective customers, or both. Second, the Agreement

REDACTED

Mr. James R. Hawkins II
June 10, 2002
Page 3


bars Mr. Chardavoyne from having either employment with or any interest in, or both, any of the
Company's competitors. Third, it further prohibits him from providing any services to any of the
Company's competitors, whether directly or indirectly. Finally, the Agreement forbids Mr.
Chardavoyne's either soliciting any of the Company's employees to leave her or his employment with the
Company.

The Company believes that it made a generous separation agreement offer to Mr. Chardavoyne
given the alternative of his employment's termination without cause. Its offer provided advantages to Mr.
Chardavoyne. The offer maintained the Company's payment of his salary for one year. It also added a
lump sum payment of $50,000 that his employment's termination pursuant to the agreement lacks
altogether. The separation agreement offer further eliminates the year of Mr. Chardavoyne's idleness that
the Agreement essentially requires for a termination without cause. It further maintains essentially the
same restrictive covenants as the Agreement, although it states them with greater specificity.

In view of these circumstances, the Company considers Mr. Chardavoyne's rejection of its
separation agreement offer and his counterproposal to be unfortunate at a minimum. The Company asked
me to explain Mr. Chardavoyne's current choices in detail, because his unrealistic counteroffer
communicated two alternative messages. On the one hand, Mr. Chardavoyne misperceives the
consequences of the Company's notice of his employment's termination without cause given to him on
May 29, 2002. Alternatively, he lacks any desire to negotiate a separation agreement. The Company still
believes that its offer presented Mr. Chardavoyne with a better alternative to the termination of his
employment without cause pursuant to the Agreement. Although it will listen to any reasonable requests
to negotiate changes to its offer, Mr. Chardavoyne's counteroffer far exceeded reasonable requests.
Please contact me directly if Mr. Chardavoyne has a genuine interest in negotiating a realistic separation
agreement and in concluding this matter within the 21-day period. Otherwise, the Company will proceed
with its termination of his employment without cause pursuant to the Agreement.

Sincerely,

Gerald M. Richardson

cc:    Mr. Matthew Huckin

# EXHIBIT B

# DAVID E. CHARDAVOYNE
## 27 COVENTRY LANE
### TRUMBULL, CT 06611-1050
TEL: 203.268.7382   FAX: 203.459.8048

June 10, 2002

CERTIFIED MAIL – RETURN RECEIPT REQUESTED

Matthew Huckin, Human Resources Director
Thames Water Americas
1101 Laurel Oak Road, Suite 120
Voorhees, NJ 08043

Dear Matthew:

This is in response to your June 3, 2002 letter which was received on June 5, 2002.

I do not have the safety box deposit key in Connecticut. It is most likely in my office in Voorhees: accordingly, please have my administrative assistant, Jacqueline Walsh, call me at 203.268.7382 and I will provide her with the likely locations within my office, so she may find it for you.

Enclosed, per your request, are the following:

1. NatWest VISA card No. 4459 5895 8000 2293

2. AT&T telephone card No. 864 069 0608 8080

3. Chase Master Card No. 5473 1580 0311 3068

As you are aware from Mr. Hawkins' June 3, 2002 letter to you [additional copy enclosed], I have retained legal counsel as recommended by you and Jim McGivern on May 29, 2002. Accordingly, with respect to the other matters referred to in your letter, an authorized representative of the company should contact him directly.

Very truly yours,

DEC 0244

**U.S. Postal Service**
**CERTIFIED MAIL RECEIPT**
*(Domestic Mail Only; No Insurance Coverage Provided)*

| | |
|---|---|
| Postage | $  57 |
| Certified Fee | 2.10 |
| Return Receipt Fee (Endorsement Required) | 1.50 |
| Restricted Delivery Fee (Endorsement Required) | |
| Total Postage & Fees | $ 4.17 |

Postmark Here
MAY 20 2002

Sent To
*MATTHEW HUCKIN*
Street, Apt. No.; or PO Box No.
*1101 LAUREL OAK RD.*
City, State, ZIP+4
*VOORHEES, NJ 08043*

PS Form 3800, January 2001          See Reverse for Instructions

7002 0510 0000 7665 0511

---

**SENDER: COMPLETE THIS SECTION**

- Complete items 1, 2, and 3. Also complete item 4 if Restricted Delivery is desired.
- Print your name and address on the reverse so that we can return the card to you.
- Attach this card to the back of the mailpiece, or on the front if space permits.

1. Article Addressed to:

*MATTHEW HUCKIN*
*THAMES WATER AMERICAS*
*1101 LAUREL OAK RD.*
*SUITE 120*
*VOORHEES, NJ 08043*

**COMPLETE THIS SECTION ON DELIVERY**

A. Signature
X _____   ☐ Agent
                      ☐ Addressee

B. Received by ( Printed Name)   C. Date of Delivery
*Adriene Carman*   6-12-02

D. Is delivery address different from item 1?   ☐ Yes
If YES, enter delivery address below:   ☐ No

3. Service Type
☒ Certified Mail   ☐ Express Mail
☐ Registered   ☐ Return Receipt for Merchandise
☐ Insured Mail   ☐ C.O.D.

4. Restricted Delivery? (Extra Fee)   ☐ Yes

2. Article Number
(Transfer from service label)   7002 0510 0000 7665 0511

PS Form 3811, August |   7002 0510 0000 7665 0511   102595-01-M-2509

DEC 0245

# EXHIBIT C

1

```
 1                 UNITED STATES DISTRICT COURT
 2              FOR THE DISTRICT OF CONNECTICUT
 3    *   *   *   *   *   *   *   *   *   *   *   *
 4    DAVID E. CHARDAVOYNE,                  *
 5                        Plaintiff          *
 6                                           *      Civil Action No.
      VS.                                    *      3:03-CV-56(WWE)
 7                                           *
      THAMES WATER HOLDINGS, INC.,           *
 8    THAMES WATER NORTH AMERICA,            *
      INC.,                                  *
 9                        Defendants         *
10    *   *   *   *   *   *   *   *   *   *   *   *
11                                            Westport, CT
12                                            September 2, 2005
13                                            10:10 A.M.
14
15              DEPOSITION OF DAVID E. CHARDAVOYNE
16
      APPEARANCES:
17
              FOR THE PLAINTIFF:
18
                      FINN DIXON & HERLING, LLP
19                    BY:  JAMES R. HAWKINS, II, ESQUIRE
                           One Landmark Square
20                         Stamford, CT  06901
21            FOR THE DEFENDANTS:
22                    HALLORAN & SAGE, LLP
                      BY:  STEPHEN P. FOGERTY, ESQUIRE
23                         315 Post Road West
                           Westport, CT 06880
24
              ALSO PRESENT:  JOHN ROMEO
25
```

COPY

108

1      Q.      When you read the letter, it was clear to you

2   that your services were not longer required by the company,

3   was it not?

4                      MR. HAWKINS:  Object to the form of the

5   question.

6      A.      No, that's not correct.

7      Q.      What did you interpret the first sentence of

8   that letter to mean, if anything?

9      A.      Number one, this is a letter from Matthew

10  Huckin and he has no authority to write this type of letter.

11     Q.      Then why didn't you go back to work the next

12  day?

13     A.      I visited with my attorney the next day.

14     Q.      You are the president of a company, you are

15  still employed, why didn't you go to work?

16     A.      I was asked not to go to the office while I

17  was looking at this document.

18     Q.      Why did you listen to the requests or demands

19  or instructions of Matt Huckin if he had no authority over

20  you or no authority to make such requests or demands?

21                     MR. HAWKINS:  Object to the form of the

22  question.

23     A.      Maybe I should have, but I know that they

24  changed the locks so I couldn't get in.

25     Q.      You didn't go and check the door, did you?

109

1    A.    Did I personally check the door, no.

2    Q.    Did you send someone to check the door to see

3  if you can get back into work that day?

4    A.    I was advised that the locks were changed.

5    Q.    That's not why you didn't return to work, is

6  it, Mr. Chardavoyne?

7    A.    I needed time with my attorney, which is why

8  I didn't return to work the next day.

9    Q.    Did you return the day after that?

10    A.    And since that I have proceeded on advice of

11  counsel.

12    Q.    You have proceeded on the advice of counsel

13  from the day after May 29, 2002?

14    A.    That's correct.

15    Q.    And who was your counsel at that time?

16    A.    Jim Hawkins.

17    Q.    As of May 30th, 2002?

18    A.    Yes.

19    Q.    Now, is it your testimony that the reason you

20  didn't return to work is because you were advised by your

21  counsel not to return to work?

22                MR. HAWKINS:  We need a break.

23                (Whereupon, Mr. Hawkins and the deponent

24  left the room.)

25                (There was a short break.)

115

1   letter.  I am just saying were you provided with a copy of a

2   letter that said this -- let's make it clear, May 29th was

3   the notice.

4                    MR. HAWKINS:  Object to the form of the

5   question.  Show him the letter, see if that's what it says.

6                    MR. FOGERTY:  I don't choose to at this

7   time, I am asking his recollection.

8        A.      There was a letter giving the opinion of

9   somebody from -- I believe it was Joe Richardson from the

10  Lowenbaum firm.

11       Q.      And you disagreed with that, right?

12       A.      Absolutely.

13       Q.      I am showing you DEC244, you returned your

14  credit cards and telephone card to Mr. Huckin?

15       A.      Mm-hmm.

16                    MR. HAWKINS:  That is yes?

17       A.      Yes.  I'm sorry.

18       Q.      And you advised at that time that you had

19  retained counsel, and to deal with your counsel in the

20  future; is that right?

21       A.      That's correct.

22       Q.      And is there a reason why you returned the

23  telephone card and the credit cards if you were still

24  employed by the company?

25       A.      This is an administrative detail.  If the

116

1    company wanted the cards back, I send them back.  I was not

2    going to be in any position of being insubordinate.

3            Q.      And why did you send them to Mr. Huckin?

4            A.      Because he happened to be the one who asked

5    for them in the letter.  It's a minor administrative detail.

6            Q.      Did he also ask for the car back at some

7    point?

8            A.      Yes.

9            Q.      Did you give the car back?

10           A.      No.

11           Q.      Why not?

12           A.      Because the car was provided for in my

13   employment agreement and I was still an employee.  Credit

14   cards, telephone cards and Mastercard and all that are not

15   provided for in my employment agreement.

16           Q.      Wasn't the car for business use as well as

17   personal use?

18           A.      It was for both, yes.

19           Q.      Wasn't the personal use ancillary to these

20   issues?

21                   MR. FOGERTY:  Objection to the form.

22           A.      I have to look at the contract.

23           Q.      Can you get Exhibit 10?  Showing you what's

24   been marked as Exhibit 10, which is a copy of the executed

25   agreement.  Drawing your attention to paragraph seven which

157

1          Q.      -- that controls those stocks?

2                        MR. HAWKINS:  I object to the form of

3      the question.

4          A.      I have not read the detailed plan.

5          Q.      So you don't know whether they are being

6      properly held or not, do you?

7                        MR. HAWKINS:  Object to the form of the

8      question.  Asked and answered.  We've been over this.

9          A.      It's my opinion they are being improperly

10     withheld.

11         Q.      Without reading the plan, right?

12                       MR. HAWKINS:  Object to the form.

13     Argumentive.

14                       (Whereupon, a recess was taken.)

15                       (The deposition continued.)

16     BY MR. FOGERTY:

17         Q.      When was the first time anyone told you to

18     return the car?

19         A.      I don't recall.

20         Q.      Were you told more than once to return the

21     car?

22         A.      I believe so, yes.

23         Q.      And did you refuse to return the car?

24         A.      Yes.

25         Q.      And was that refusal based on your belief

## CERTIFICATION

      This is to certify that on this 16th day of July, 2008, a copy of the foregoing was caused to be served via U.S. mail, postpaid to:

Patrick McHugh, Esq.
William M. Tong, Esq.
Finn Dixon & Herling LLP
177 Broad Street, 15th Floor
Stamford, CT 06901-2048

The Honorable Warren W. Eginton
c/o Chambers
United States District Court
  for the District of Connecticut
915 Lafayette Boulevard
Bridgeport, CT 06604
***(Courtesy Copy, Via Hand Delivery)***

_____
Ralph W. Johnson III

1214497_1 DOC